Argued and submitted December 11, 1989, reversed April 25, reconsideration allowed
by opinion July 25, 1990
See 102 Or App 559 (1990)

In the Matter of John Woolridge,
Alleged to be a Mentally Ill Person.

## STATE OF OREGON,
*Respondent,*

*v.*

## JOHN WOOLRIDGE,
*Appellant.*

(89-03-95685; CA A60515)

790 P2d 1192

Gary K. Kahn, Portland, argued the cause and filed the brief for appellant.

Keith W. Wingfield, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were

Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Graber, Presiding Judge, and Riggs and Edmonds, Judges.

## RIGGS, J.

Appellant appeals from an involuntary commitment order, claiming that the order is not based on clear and convincing evidence that he is mentally ill. ORS 426.005(2).[1] We review *de novo, State v. O'Neill,* 274 Or 59, 545 P2d 97 (1976), and reverse.

On March 26, 1989, the Portland emergency service center received a phone call from a man who stated, "I want to report a firebombing to Mayor Bud Clark's house," and hung up. The call was traced to a phone booth that was empty when Officer McDermott arrived to investigate. A security guard, who had been sitting in a restaurant directly across the street from the booth, provided McDermott with a description of a man that he had seen making a call approximately ten minutes earlier. McDermott broadcast the description and another officer located appellant, who matched that description, approximately a block and a half away.

McDermott testified that appellant was extremely upset and agitated. He described appellant's conversation as disjointed and unfocused and his behavior as "inconsistent," with frequent mood swings between anger and sadness. Because of appellant's demeanor and McDermott's uncertainty whether he was capable of forming the intent that would be necessary for any criminal charges, the officer took him to Dammasch State Hospital.

On the way to Dammasch, appellant denied making any phone calls from the booth and, at one point, began kicking the metal divider at the bottom of the plexiglass shield separating him from McDermott. That behavior continued for several minutes, and then he sat calmly for the rest of the ride.[2]

---

[1] ORS 426.005(2) provides, in pertinent part:

" 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"(a) Dangerous to self or others.

"(b) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

[2] McDermott testified that, when appellant began kicking, he radioed the dispatcher to request another officer to accompany him to Dammasch. However, appellant quickly stopped, and McDermott determined that there was no need for another officer.

At the hospital, McDermott was present when appellant was interviewed. McDermott testified that, when the doctor informed appellant that he was brought to Dammasch because he was suspected of making threatening phone calls, appellant replied that "they were just prank phone calls." The following day, a mental health investigator spoke with appellant and recommended that a citation for a commitment hearing and a detention warrant be issued. The investigator's report stated:

> "I asked Mr. Woolridge why he was in the hospital. He told me 'I made a threatening phone call. I threatened to blow up the Mayors [*sic*] office.' He told me he was just making crank calls."[3]

At the hearing, in response to the question of whether appellant displayed any threatening behavior, McDermott testified about the incident in the back of the police car.[4] The two examiners who testified concluded that, although appellant suffers from a mental disorder, he is not a danger to himself or to others or unable to care for his basic needs and that he should be discharged. The judge rejected those recommendations, finding that

> "[b]oth the examiners are recommending discharge, but both examiners agree that this gentleman suffers from a mental disorder. I place more concern on his conduct and I don't think — the evidence is clear that he did make these threatening phone calls and he threatened to blow up the Mayor's office. That kind of conduct is going to get him in harm's way if not qualify as danger to others. So I feel he should be committed. * * * Those kinds of threats are frightening to people. That is a danger to others."

---

[3] The report also stated that appellant had had two prior psychiatric hospitalizations, one in Texas, another in Washington. After each hospitalization was noted in the report, it stated, "says they tried to commit him." Appellant testified that "they tried to commit me a few times, but it always came up negative mental." He also testified that he voluntarily committed himself because of depression; however, he was released after a few days, because it was determined that institutionalization was unnecessary.

[4] McDermott testified that appellant stated that he had martial arts skills, but only used them in self-defense when he was harrassed or threatened and "would never use it to attack someone." Appellant also testified about various altercations with individuals at bus stops or on the streets. He stated that people approached him menacingly for money, alcohol and drugs, and he explained that he would think of hurting somebody "[o]nly when somebody tries to beat the hell out of me. If somebody tries to hit me, I am just like anybody else. Nobody in their right mind is going to stand there and let somebody just slap the holy crap out of them. I mean, that's stupid."

■ Appellant argues that the state failed to prove by clear and convincing evidence that he is mentally ill. He contends that the trial judge's written finding that he is dangerous to himself and unable to provide for his basic needs is inconsistent with the judge's statements at the hearing that he posed a danger to others. The state argues that involuntarily committing appellant was proper, because "[t]he trial court *could reasonably conclude* that appellant *might* carry out the threat to blow up the [mayor's] house and office in light of his violence in the police car and his demeanor in the courtroom." (Emphasis supplied.)

■ ■ Conclusions based on conjecture as to whether appellant poses a danger to others are insufficient. *State v. Nance,* 85 Or App 143, 145 n 2, 735 P2d 1217 (1987). Involuntary commitment requires clear and convincing evidence that the truth of the facts asserted is highly probable. ORS 426.130; *State v. Howell,* 53 Or App 611, 617, 633 P2d 14 (1981); *State v. Sterzicg,* 47 Or App 621, 625, 614 P2d 631 (1980). The existence of a mental disorder alone is insufficient to constitute mental illness as defined by statute. *State v. Allmendinger,* 36 Or App 381, 584 P2d 773 (1978). Instead, the mental disorder must cause a person to be dangerous to himself or others or unable to care for his basic personal needs. ORS 426.005(2). Whether a person poses such dangerousness or lacks that ability is properly determined by his condition at the time of the hearing. *State v. Lucas,* 31 Or App 947, 950, 571 P2d 1275 (1977). "Past verbal acts, while probative, must be supported by evidence that they clearly form a foundation for predicting future dangerousness" in order to justify the finding that a person is mentally ill. *State v. Fletcher,* 60 Or App 623, 628, 654 P2d 1121 (1982). We conclude that the state failed to meet the necessary burden of proof to establish appellant's mental illness.

There is insufficient evidence to support the finding that appellant was unable to meet his basic needs.[5] Further, there is little to indicate that he is a danger to himself, other

---

[5] Appellant pays rent on a house where he lives with his girlfriend. He testified that he supports himself by working odd jobs and by disability income and that he had several cleaning jobs that he could get if he were released. He also testified that he had carpentry, electrical, electronic and plumbing skills, stating, "I am anything but helpless."

than the trial court's conclusion that appellant would find himself in "harm's way" if his conduct continued. Neither McDermott nor the examiners who testified at the hearing found that he posed such a danger, and there is nothing in the Dammasch investigator's report to support that conclusion.

Although there is some evidence to support the finding that appellant is dangerous to others, it is not clear and convincing. Even if defendant made the phone call, and even if it was a "threatening," rather than a "crank or prank" call, there was no evidence that he committed *any* overt act to follow up on the threats. We have previously held that "[m]ere threats of violence or verbal hostility standing alone are insufficient to show mental illness." *State v. Allmendinger, supra,* 36 Or App at 383. Here, appellant did no more than that.

The only evidence of violent behavior was the kicking incident in the back of the police car. McDermott testified that appellant did not resist arrest and that the kicking quickly stopped and was clearly not directed toward a person. Appellant's angry reactions while in the confinement of the police car do not prove that he is a danger to others. Although the fact of appellant's mental disorder was undisputed, there is nothing in the record to show that the phone call or kicking "clearly for[m] the basis for a prediction of future dangerousness."[6] *State v. Lucas, supra,* 31 Or App at 950.

Reversed.

---

[6] We note that McDermott's report stated: "CRISS shows Mr. Woolridge to be suspect in a phone threat dated 2/28/89 PPB case #89-18718." However, there was no explanation of that entry.