Submitted on record and briefs December 4, 2000, affirmed October 31, 2001

In the Matter of Jeffrey King,
Alleged to be a Mentally Ill Person.

## STATE OF OREGON,
*Respondent,*

*v.*

## JEFFREY KING,
*Appellant.*

C990001MC; A105266

34 P3d 739

Susan D. Isaacs filed the brief for appellant.

Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and Cheryl Thompson-Merrill filed the brief for respondent.

Before Edmonds, Presiding Judge, and Armstrong and Kistler, Judges.

EDMONDS, P. J.

**EDMONDS, P. J.**

Appellant appeals from an involuntary mental commitment order. ORS 426.130. He argues that the trial court erred in finding that there is clear and convincing evidence that he is a danger to others due to his mental illness and that he would not willingly and voluntarily participate in treatment. ORS 426.005(1)(d); ORS 426.130(1)(b). We review *de novo, State v. O'Neill,* 274 Or 59, 61, 545 P2d 97 (1976), and affirm.

Appellant was 41 years old at the time of the hearing. He has a bipolar and schizophrenic condition. His delusions and misperceptions of reality cause him to act on false beliefs. He has been hospitalized for his disorder over 20 times. Although he is generally pleasant when taking his medication, his condition is "very fragile." Even with his medication, he suffers from periodic episodes during which he sleeps less, has disorganized thoughts and impulsive behavior, and is increasingly irritable. Those episodes result from internal factors, such as his body naturally flushing the medication out of his system, or from external factors, such as stressful events.

During one of those episodes, appellant verbally threatened a caregiver in the group home where he lived. For three days before the incident, appellant had been angry. He had been kicking things, throwing his fists around, and had not been sleeping. Appellant decided to walk to a store 15 minutes away and, as a result, missed his morning medications. His caregiver, who had worked weekends at the group home for two months at that time, had never before had a problem with appellant missing his medication. Appellant called the caregiver from the store and asked her to come and pick him up because it was cold outside. When she refused, he screamed at her and hung up the telephone. He then called her back immediately and told her that he was coming to the house to kill her, that he was going to put her in a closet, steal her car, and drive to Portland. However, appellant did not return to the group home. The caregiver called the police, and appellant was found in a restaurant several hours later. He had never threatened the caregiver before.

Appellant was hospitalized after that incident. The hospital records admitted into evidence at his commitment hearing reflect that he was kept in restraints for two days under heavy medication because of his "unpredictable, agitated, and hostile behavior as well as [his] inability to accept verbal redirection without becoming hostile." Thereafter, he was kept in a locked room for another 13 days before the commitment hearing. The records recite:

> "[Appellant] remains grossly psychotic, manifesting paranoid delusions and [is] extremely disorganized with almost no impulse control. As a function of this, he has necessitated locked seclusion throughout his hospitalization. Although disorganized, he has continued to express impulsive, angry and hostile and paranoid ideation regarding staff members."

Appellant was heavily sedated throughout his hospital stay and generally did not sleep well. He also defecated on the floor of his room on one occasion and frequently had problems remaining appropriately attired.

At the hearing, appellant behaved and responded to questions appropriately. One of the nurses, who had treated him during four previous hospitalizations, also testified. She said that the incident with his caregiver was likely a product of a "decompression" and that when he was in a "decompressed" state, appellant

> "wouldn't carry out a threat in planning to do that, it would be more impulsive, but the result might be the same. * * * I think that he doesn't really (indiscernible) to hurt someone (indiscernible) a plan but rather (indiscernible) but his illness would, like cause him to strike out."

The nurse said that she thought appellant was a danger to himself and "probably" a danger to others. She said that she had had no problem in the past in getting appellant to take his medications, but she acknowledged that he did not really have the option to refuse his medication in the settings in which she had worked with him. She also recommended that he be discharged to an intermediate care facility and then to his previous group home or to a similar group home. A medical examiner examined appellant at the hearing, and he said that appellant was not an "imminent" danger to himself or

others. The trial court found that there was clear and convincing evidence that appellant was mentally ill under the statute because he was a danger to others and that he would probably not willingly participate in voluntary treatment.

■ Appellant argues that the state failed to prove by clear and convincing evidence that he is mentally ill and poses a danger to others. Under ORS 426.005(1)(d), a person must have a mental disorder and must be dangerous to self or to others, or unable to care for his or her basic needs, in order to be mentally ill. Under ORS 426.130, a finding that a person is mentally ill for purposes of an involuntary commitment requires clear and convincing evidence of one of the statutory criteria for commitment. Clear and convincing evidence is evidence that makes the fact in issue highly probable.

■ In this case, the trial court found that appellant poses a danger to others. In order to affirm that finding, there must be clear and convincing evidence sufficient to form a foundation to predict future dangerousness. Whether a person falls within the definition of the statute is determined by his condition at the time of the hearing as understood in the context of his history. *State v. Woolridge,* 101 Or App 390, 394, 790 P2d 1192, *mod on recons* 102 Or App 559, 794 P2d 1258 (1990). We have found generally that where a mentally ill person has threatened and has committed overt violent acts against others in the past, the clear and convincing evidence standard is met. *See, e.g., State v. Bodell,* 120 Or App 548, 853 P2d 841 (1993); *State v. Furnish,* 86 Or App 194, 738 P2d 607 (1987). We also have found in several cases that, where the defendants had made only verbal threats in the past, there was not clear and convincing evidence to satisfy the future dangerousness requirement. *See Woolridge,* 101 Or App at 394; *see also State v. Howell,* 53 Or App 611, 633 P2d 14 (1981); *State v. Sterzicg,* 47 Or App 621, 614 P2d 631 (1980). However, in *State v. Pieretti,* 110 Or App 379, 823 P2d 426 (1991), *rev den* 313 Or 354 (1992), we ruled that there was ample evidence of future dangerousness, even though the defendant had not committed any overt violent act. The evidence in *Pieretti* showed that the defendant began swearing and making vulgar sexual references to friends and family. He also made graphic threats to kill at least four people, and

he acted violently when faced with everyday frustrations. His demeanor at the hearing was uncontrolled with exhibitions of vehemence, anger, agitation, and high emotionalism. Two examiners at the hearing observed the defendant and opined that he had a mental disorder. However, one said that he was not a danger to others and recommended that he be discharged. The other examiner in a report wrote "yes?" to the inquiry of whether the defendant was a danger to others. Nonetheless, we were persuaded that the defendant's loss of self-control was so great that he posed a danger to others.

"Fact matching" in these kinds of cases is often of little utility because every involuntary mental commitment case must be decided on its individual facts under the applicable standards. Nevertheless, our case law informs the issue in this case to the extent that it demonstrates how we have interpreted the "future dangerousness" standard imposed by the law. In this case, we find persuasive the history of reoccurring decompressions that can be triggered at any time by factors beyond defendant's control, the need for restraints during the episode in the hospital, and the testimony of the nurse who testified that defendant's illness could cause him to strike out. While the opinion of the examiner may conflict with that evidence, we are persuaded that defendant's conduct during the 15 days that he was in the hospital is more truly indicative of the danger that he presents to others than is indicated by his demeanor at the hearing. We conclude based on this evidence that the state has met its burden of proof as to defendant's dangerousness to other people.

Also, in light of the nurse's testimony and the evidence in the hospital records, we find that voluntary treatment is not in defendant's best interest even if he is willing to participate in it. ORS 426.130(1)(b)(C).

Affirmed.