Argued and submitted October 15, reversed December 8, 2004

In the Matter of Vivian Beil,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

VIVIAN BEIL,
*Appellant.*

MC 030045; A122453

102 P3d 757

Kent A. Anderson argued the cause and filed the brief for appellant.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Deits, Presiding Judge pro tempore, and Haselton and Linder, Judges.

LINDER, J.

Deits, P. J. pro tempore, concurring.

## LINDER, J.

Appellant appeals a circuit court order finding her to be a mentally ill person and committing her to the Mental Health Division for treatment. The order was based on a finding that appellant suffers from a mental disorder, is unable to provide for her basic personal needs, and is dangerous to others. ORS 426.005(1)(d). Appellant concedes that she suffers from a mental disorder but argues that the court's findings that she is unable to provide for her basic needs and that she is dangerous to others are not supported by clear and convincing evidence, as required by ORS 426.130. On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976),[1] we reverse.

■ Appellant was 56 years old at the time of the commitment hearing. Before she was taken into custody on the current commitment, she was living on her own in an apartment in Pendleton. She receives social security income and has a daughter who lives in the area. Appellant has a long history of psychosis that has resulted in at least five previous hospitalizations since 1980. Although various diagnoses are consistent with appellant's symptoms and behavior, she most likely suffers from chronic paranoid schizophrenia.

Appellant's current commitment arose after neighbors reported to police that appellant had been threatening them. Debra Rood, a precommitment investigator, was called to the apartment by police to assess appellant's mental condition. Consistently with her history of psychosis, appellant was confused and disoriented. Appellant also was "extremely

---

[1] *See* ORS 19.415(3). We note that the legislature amended ORS 19.415(3) in 2003. Or Laws 2003, ch 576, § 88 ("Upon an appeal from a [*decree*] **judgment** in a **case that constituted a** suit in equity **under common law**, the Court of Appeals shall try the cause anew upon the record." (Additions in boldface; deletions italicized in brackets.)). We need not decide whether the 2003 amendments to ORS 19.415(3) affect our standard of review because those amendments apply only to the appeal of judgments that were entered on or after January 1, 2004. *See* Or Laws 2003, ch 576, § 90a ("The amendments to ORS * * * 19.415 * * * by sections 85 to 89 of this 2003 Act apply only to the appeal of judgments entered on or after the effective date of this Act. Any appeal of a judgment entered before the effective date of this 2003 Act shall continue to be governed by the law in effect on the day immediately preceding the effective date of this Act."). Based on the plain meaning of the text of Oregon Laws 2003, chapter 576, section 90a, we apply the 2001 version of ORS 19.415(3) in this case.

labile," with her mood alternating between laughing, being agitated, and crying. Rood described appellant's apartment as "filthy and unsanitary." Several-week-old garbage was all over the floor, and the apartment smelled to the point of being "nauseating." Rood recommended that appellant be medically evaluated and that, if there was no medical reason for her condition, she be admitted to the Eastern Oregon Psychiatric Center (EOPC). Appellant was later admitted to EOPC, where Rood tried to evaluate appellant further but was unsuccessful because appellant would not talk to her.

Rood, appellant's treating psychiatrist Dr. Sekiya, and appellant's daughter were witnesses at the hearing. All three testified that appellant's illness causes her to become verbally aggressive at times. According to Sekiya, appellant's verbal aggression is consistent with the mood disorder aspect of her illness. Sekiya stated that appellant's verbal aggression was concerning, but only because her verbal aggression possibly could rise to a level that could constitute unlawful harassment. Rood, on the other hand, believed that appellant's verbal aggressiveness might cause her to become physically aggressive. But Rood was not personally aware of any time that appellant had been assaultive or physically violent toward anyone else.[2] Appellant's daughter likewise expressed concern about appellant's verbal aggressiveness, which the daughter typically managed by not arguing with appellant when they disagreed and by cutting her visits with appellant short, if necessary, to keep appellant from becoming too agitated.[3]

_____

[2] The record includes evidence that Rood was aware that the report to police included information that appellant had assaulted a neighbor. The trial court sustained a hearsay objection to that evidence, however, and permitted Rood to testify to that fact only for purposes of establishing her reason for being called to evaluate appellant, not to establish that such an assault occurred. Beyond that, Rood acknowledged in her testimony that she was not personally aware of any assaultive behavior on appellant's part.

[3] The daughter visited appellant in appellant's apartment and apparently sometimes brought her own children (appellant's grandchildren) along. The daughter testified that, when her children are with her on visits, she leaves if appellant becomes too verbally aggressive because of concern that appellant might become physically abusive in the children's presence. The daughter did not cite any instance in which that had happened, however, nor did she explain further the type of physical abuse that concerned her.

Rood was also concerned that appellant could not meet her basic needs. Rood based her conclusion primarily on the unsanitary condition of appellant's apartment, her poor hygiene, and a concern that she was not eating adequately. The garbage in appellant's apartment included spoiled food. Although appellant was of average weight, Rood thought she looked very pale, was "kind of shaky," and her hair was disheveled. Rood questioned appellant's ability to shower and otherwise care for her hygiene if she were not in a structured environment. Rood also believed that appellant was in danger because she tended to turn up the heat in her apartment in the summer, rather than turn on the air conditioning. Finally, while living on her own in her apartment, appellant was not taking her medications for her mental illness, which caused her to become manic, stay up all night, and bang on the walls of her apartment.

Rood's concerns about appellant's ability to meet her basic needs were echoed by both Sekiya and appellant's daughter. Sekiya thought appellant's ability in that regard was difficult to assess, but the fact that her apartment was not "in good livable condition," that she appeared disheveled, and that she had poor hygiene led him to believe that she could not meet her basic needs. Appellant's daughter had not visited appellant in the past two or three months, but she described appellant as living in a very unkempt house, with spoiled food and garbage throughout. According to the daughter, because appellant keeps the windows closed, the smell often was "sickening." Since the daughter's last visit two or three months before the hearing, appellant had lost approximately 30 pounds and had gone from being overweight to being of average weight (about 165 pounds), a fact that caused the daughter to feel "pretty sure" that appellant was not eating properly.

At the conclusion of the hearing, the trial court found:

"[T]he court does find that [appellant] does suffer from a mental illness, a chronic psychosis; that as a result of that mental illness that through her verbal aggression and her psychosis that puts some limits on her thinking process; that she is a danger to others.

"Although this is a much closer question, I am also going to find that she's not able to take care of her basic needs. The evidence being in the last two months [that] she's lost 30 pounds. While she's not immediately at risk, that she is—was putting herself in a situation where that could readily come to pass because of her mental illness and her— her living conditions, and evident[ ] inability to care for herself with regards to her eating."

We agree with appellant that neither ground for appellant's commitment is supported by clear and convincing evidence. With regard to whether appellant is a danger to others because of her mental illness, "[w]e have found generally that where a mentally ill person has threatened and has committed overt violent acts against others in the past, the clear and convincing evidence standard is met." *State v. King*, 177 Or App 373, 377, 34 P3d 739 (2001). Conversely, when an allegedly mentally ill person has not engaged in any past overt violent acts or made overt threats of violence under circumstances that make actual future violence highly likely, we have found the evidence insufficient to satisfy the future dangerousness requirement. *Compare State v. Woolridge*, 101 Or App 390, 394, 790 P2d 1192 (1990) (isolated threat, unaccompanied by any overt act to follow up threat, insufficient), *State v. Howell*, 53 Or App 611, 633 P2d 14 (1981) (no evidence of verbal threats or physical violence), *and State v. Sterzicg*, 47 Or App 621, 614 P2d 631 (1980) (verbal threats insufficient), *with State v. Pieretti*, 110 Or App 379, 383-84, 823 P2d 426 (1991), *rev den*, 313 Or 354 (1992) (graphic threats to kill, coupled with violent reactions to frustration, were sufficient to establish future dangerousness even in the absence of past violent acts towards others). Here, we know only that appellant often becomes verbally angry and agitated due to her mental illness. In the absence of evidence that she has made actual threats of overt violence or has engaged in any overt acts of violence, we cannot find by the requisite clear and convincing standard that appellant is a danger to others.

Nor, on this record, are we satisfied that appellant is unable to meet her basic needs. "Basic needs are 'those things necessary to sustain life.' " *State v. Sea*, 137 Or App 333, 336, 904 P2d 182 (1995) (quoting *State v. Brungard*, 101 Or App

67, 71, 789 P2d 683, *modified on recons*, 102 Or App 509, 794 P2d 1257 (1990), *rev den*, 311 Or 427 (1991)).

> "A person is subject to a 'basic needs' commitment * * * if clear and convincing evidence demonstrates that, due to a mental disorder, there is a likelihood that the person probably would not survive in the near future because the person is unable to provide for basic personal needs and is not receiving care necessary for health or safety."

*State v. Bunting*, 112 Or App 143, 146, 826 P2d 1060 (1992).

Here, the state does not argue that the unsanitary nature of appellant's apartment or her poor hygiene was life-threatening. No witness testified to that effect. Nor does the record support such an inference, at least by clear and convincing evidence, given the daughter's testimony suggesting that that was the normal state of appellant's apartment and hygiene and had been so for some time. Instead, the state relies solely on the fact that appellant's weight had decreased by about 30 pounds in the two or three months before the hearing.

The problem with the state's argument is that nothing in this record suggests that appellant's weight loss was life-threatening. Before that weight loss, appellant had been significantly overweight, weighing in excess of 190 pounds. At the time of the hearing, she was of average weight (*i.e.*, about 165 pounds). The record lacks any medical or other testimony to establish that the amount of weight that appellant had lost or the time period over which she apparently had lost it posed a health threat to her. *See State v. Turel*, 182 Or App 235, 240, 48 P3d 175 (2002) (evidence insufficient for basic needs commitment where no medical or other evidence established that appellant's resistance to treatment of his chronic psoriasis was a significant threat to his future survival). For that reason, we cannot find, by a standard of clear and convincing evidence, that appellant's weight loss means that appellant "probably would not survive in the near future." *Id.* (internal citation omitted).

Reversed.

**DEITS, P. J. pro tempore,** concurring.

I agree with the majority's disposition of this matter. I write only to emphasize that our decision to reverse the decision of the trial court is necessitated by the state of the record in this case.

We recognize that the parties and the trial court often know a great deal more about the person for whom commitment is sought from both additional materials and experiences, including observations of the person's behavior that are not made part of the record. In view of such additional information to which the trial court may have access, we are reluctant to second guess the trial court's decision. Nonetheless, our review of the trial court's decision is confined to the appellate record. Because of that, I would urge litigants and the trial courts involved in mental commitment proceedings to develop as complete a record as practically possible and in particular to put into the record observations about the person and his or her behavior in the courtroom than would not otherwise be apparent from the record.