Argued and submitted August 20, 2004, reversed February 16, 2005

In the Matter of Jimmy Pike,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

JIMMY PIKE,
*Appellant.*

4751; A121046

106 P3d 693

George W. Kelly argued the cause and filed the brief for appellant.

Michael C. Livingston, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

Appellant seeks reversal of the trial court's order committing him to the Mental Health and Developmental Disability Services Division for a period not to exceed 180 days after its finding that he is mentally ill under the criteria of ORS 426.005(1)(d)(B).[1] The issue on appeal is whether there is clear and convincing evidence that, at the time of the hearing, appellant was unable to provide for his basic personal needs and was not receiving such care as was necessary for his health and safety as the result of his mental disorder. ORS 426.130(1)(b). Under the above standard, the truth of the facts asserted by the state must be highly probable. *State v. Waites*, 71 Or App 366, 369, 692 P2d 654 (1984). We review *de novo*, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), and reverse.

Based on the record before us, we find as follows. Appellant suffers from chronic schizophrenia. He has received social security benefits for many years. His sister is the payee for his benefits, and appellant lived with his mother until she died in November 2002, approximately three months before the hearing in this matter. After his mother's death, appellant lived by himself until December 22 when his sister found him in his apartment after he had fallen and broken his hip. She testified that she arrived at his apartment between 3:00 and 3:30 p.m., and he told her that he had been lying there since 11:00 a.m. Although there was a phone on other side of the room, the sister testified that "he don't like the phone near him because he didn't like getting woke up by the phone." Appellant believed that he was suffering from a "charlie horse." As a result of his injury, appellant was hospitalized. Eventually, he was sent by the hospital to a nursing home to recover, but was returned to the hospital's "Mental Health Unit" from the nursing home

---

[1] ORS 426.005(1)(d) provides, in part:

" 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"* * * * *

"(B)   Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

because he was refusing his medication, the nursing home staff could not make him follow his prescribed therapy program for his injury, and, according to the staff, "they could not safely keep him there anymore."[2] This mental commitment proceeding followed appellant's return to the hospital.

Historically, appellant has always lived with one or both parents and has never lived alone. He received mental health treatment in the past from the county mental health office but discontinued that treatment in 1998. During the time that appellant lived by himself after his mother's death, appellant's sister checked on him daily. She testified that he had not bathed for five years, "when he was living with my mom, he'd never come out of the house for five years," and that "he needs somebody to make him take a bath, to make him take his medications, [and] to make him eat." When asked whether appellant is capable of preparing his own meals, appellant's sister answered, "In some ways, yes. In some ways, no." She explained,

> "Uh, if it's like boiling water for hot dogs on the stove, or cold pork and beans and stuff like that. I don't know if he knows how to make a hamburger. He'd put chicken in that little Forman's grill, and cook it that way. But then, that's all I can think of that he would eat."

She concluded that, if appellant "lived on his own," "he just won't be able to take care of himself."

The state also called appellant's brother-in-law and a registered nurse from the hospital as witnesses. The nurse testified that, after appellant returned to the hospital, he refused his medication on two occasions but otherwise had taken it when requested. As to therapy for his hip, she said:

> "When he first came in, [appellant] was getting up and walking on his right leg when he wasn't suppose to. And he said that he basically knew he wasn't suppose to, but that he'd, you know, bear the consequences of what he was doing. But that it—you know, it was his life and that, you know, would be—if something happened, it would be his responsibility."

---

[2] When asked about appellant's behavior at the nursing home, the precommitment investigator testified that "[h]e had not hurt anybody [at the nursing home], but people were afraid he might, whatever that means."

Additionally, she testified that, at a later point in time, appellant started working on his physical therapy and using a walker. "Since that time, * * * [h]e's been doing a pretty good job[.]" The nurse also testified that she had talked with appellant about his leaving the hospital. He told her that he would try to rent a trailer or camper to live in and that he would need his sister to help him obtain food, manage his money, and do his laundry. The nurse did not believe that, if released, he would care for his own hygiene, and she told the court, "I have a lot of concerns that if he wasn't on medications, and he got suspicious of his food again, that he might not eat for a long period of time."[3]

Appellant also testified. When asked where he would live if he were released, he responded, "I don't know where I want to live, actually. * * * I don't know what's available." He told the court that he would need his sister to help him as long as she was the payee for his social security benefits, but if she were unwilling, "I'd have to find me a new payee." When asked how he would obtain food, appellant answered, "the grocery store." When asked if he had ever been shopping, appellant responded, "Yeah, with my mother." When asked how he would pay for the food that he purchased, appellant replied; "My sister—she said she went down to Senior Disability place to get me—sign me up for food stamps." When asked if he could cook and what kinds of things he knew how to cook, appellant answered, "Turkey, ham, roast, hamburger, hot dogs and canned stuff."[4] When asked if he was willing to continue taking medication, appellant replied, "Yes." When asked what he would do if he became ill and "didn't feel good," appellant said, "Well, I could either call the hospital or my sister."

---

[3] The nurse testified that appellant refused to eat or drink when he was first hospitalized because "he wasn't sure what had been put in the food[.]" The hospital then began to package the food and, after appellant started taking medication, they had no additional problems in getting him to eat.

[4] Appellant also testified that a physical problem with his eyes could cause him difficulty in cooking. He said, "[I]t would be really difficult for me to cook because I know I'd have to be able to read the instructions. I don't know—if I can't read the instruction, I'd have to cook what I already know how to cook." Appellant's explanation of why he could not see well was somewhat bizarre. According to the record, he may suffer from glaucoma.

On cross-examination, appellant conceded that his sister and brother-in-law arrived "over three and a half hours" after he injured his hip and that initially, he did not want them to call an ambulance because "I wanted to wait and see if the—see if the pain—see if I would be able to move."[5] He also testified that it had been about five years since he had gone to a grocery store and he did not "really know" how long it had been since he had gone to a mental health counselor or how long it had been since he had taken medication for his mental health condition.[6]

After hearing the testimony, the mental health examiner gave the opinion that appellant was not able to provide for his basic personal needs and that he needed to be in a foster home setting. She observed that appellant was "oriented to person, place and time" and was "polite, cooperative * * * [and] understands he is having a hearing today." He could spell backwards and forwards. His "memory for remote past and significant data was good[,]" but he had "poor immediate recall." Some questions he refused to answer, "saying there were lots of things that he just does not bother with." She reported that appellant has "insight that he has a mental problem but does not think treatment is effective or even desirable." She concluded:

> "[Appellant] has never lived on his own. He does not appear to have the skills to do so now. May be able to learn how but will need supervision until he has mastered these skills."

Based on the above record, the trial court ruled, in part,

> "The difficulty is that, by his own admission as well as the substantiation of his sister and brother-in-law, [appellant] has not even been out of the house in five years. It's difficult to understand how he could possibly be self-sufficient. He's not been taking care of his own needs. He's been depending on his sister. And on the very pointed words

---

[5] Appellant testified that when he declined to have an ambulance called immediately, his brother-in-law offered him "a couple of beers."

[6] Appellant told the assistant district attorney when asked how long it had been since he had taken medication, "I don't know how long. I wasn't counting the days or the weeks or the months." Other testimony indicated that it could have been several years.

of [appellant's brother-in-law], he needs someone to provide him total care, and his sister is not able to do that. He's gone way beyond what his sister can handle.

"There is—I agree there has been quite a bit of issue raised that he hasn't been given an opportunity. However, there has been the—evidence has been clear and convincing that he has a mental illness, and the mental illness is what stands in the way of him being able to care for his own needs. * * *

"* * * * *

"How would he find a place to live if he didn't want to go outside and deal with people? I agree that it's a poor case in that he hasn't been given a chance; but I don't think there's any evidence to show that if given a chance to take care of himself, he would do any better that he has done with the kind of care his mother, and now his sister, have been giving him.

"Again, there's—the evidence is clear and convincing that he is not able to care for himself. And hopefully with this medication, hopefully over a period of time, that will change. And the commitment will be for a maximum of 180 days."

■ We do not question the good intentions of the witnesses, the mental examiner, and the trial court in this case. Our task, however, is to apply the law as the legislature has directed to the above facts. Under ORS 426.005(1)(d), a "mentally ill person" for purposes of an involuntary commitment includes a person "who, *because* of a mental disorder" is unable to provide for his basic personal needs. (Emphasis added.) Thus, properly framed under the statute, the issue in this case is whether it was highly probable at the time of the hearing that appellant was unable to provide for his basic personal needs because of his mental disorder. In other words, the statute requires a demonstration of a causal connection between the mental disorder and the inability to provide for basic personal needs before involuntary commitment is authorized. The evidence must be clear and convincing that, as a result of the person's mental disorder, there is a likelihood that the person probably would not survive in the near future. *State v. Saephan*, 189 Or App 9, 18, 73 P3d 301 (2003). The trial court reasoned that it is appellant's "mental

illness [that] stands in the way of him being able to care for his own needs." We disagree for the reasons that follow.

The nexus required by the statute is lacking in several respects. First, it is unclear that appellant's fall resulting in the injury to his hip was a product of his mental illness, and it was that event that triggered his hospitalization and, ultimately, this proceeding. Moreover, it is not clear from the record that appellant's reclusiveness and eccentricities are a result of his mental disorder, his obstinance, or his level of functional intelligence. It is equally as plausible from the record before us that he voluntarily chooses, without the influence of his mental disorder, not to exercise socially acceptable personal hygiene or to leave his abode as that his behavior is the result of his mental disorder. It is correct that he has always depended on his mother or his sister, a fact, according to his testimony and his statements to witnesses, that he recognizes. But, significantly, appellant also appears to recognize that, if his sister is not available to help him, he will need to find others to assist him to obtain food, housing, and other necessities. In other words, we are not persuaded by this record that appellant's insight regarding his personal basic needs is impaired significantly by his mental disorder.

■■ We also think it significant that all of the witnesses appear to recognize that appellant has some present ability to care for himself, but they do not think that he will carry through with his plans over a period of time without medication. They may be better predictors of the future than are we, but, as the trial court correctly observed, appellant had not yet been afforded the opportunity—except for the time period when he lived alone after his mother's death—to demonstrate whether he is able to live alone and care for himself. Involuntary commitment for a mental disorder constitutes a serious deprivation of personal liberty and cannot be imposed constitutionally solely to achieve desirable social goals such as those testified to by the mental examiner (to provide custodial care until appellant has mastered the skills to live on his own) when a nexus to a mental disorder is lacking. Here, appellant's mental acuity and the appropriateness of his responses at the time of the hearing convince us that he may be able to succeed with support. The statute requires a showing that it is highly probable that appellant will not survive

in the near future as a result of his mental disorder, and the evidence is this case simply does not rise to that level. We conclude for the above reasons that the trial court erred in committing appellant involuntarily.

Reversed.