Argued and submitted May 25, affirmed September 27, 2006

In the Matter of Graham Lawrence,
Alleged to be a Mentally Ill Person.

## STATE OF OREGON,
*Respondent,*

*v.*

## GRAHAM LAWRENCE,
*Appellant.*

0504-64153; A128401

144 P3d 967

Dianna J. Gentry argued the cause and filed the brief for appellant.

Eric D. Wilson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge,* and Brewer, Chief Judge,** and Armstrong, Judge.

ARMSTRONG, J.

---

* Edmonds, P. J., *vice* Wollheim, P. J.

** Brewer, C. J., *vice* Ceniceros, S. J.

**ARMSTRONG, J.**

Appellant appeals an involuntary commitment order. ORS 426.130(1)(b)(C). He appeals the commitment on the grounds that the state failed to prove two required conditions: that he is a "mentally ill person," ORS 426.005(1)(d)(A), and that he would not voluntarily participate in treatment, ORS 426.130(1)(b)(A). On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), we affirm.

We consider the facts about appellant at the time of the commitment hearing on April 11, 2005. Appellant is 60 years old. His marriage to his former wife was dissolved in 1988. His former wife remains in the Portland home that they once shared, and their children are now young adults. Appellant is homeless and lived until a week before the hearing in a homeless camp outside Eugene.

On April 4, 2005, appellant traveled by bus from Eugene to Portland, where he went to a police station and threatened to kill his former wife. He expressed a determination to expose certain longstanding issues that he has had with her. He told the officers at the station and the court during his hearing that his threats were "a tactic" to force a forum in which he could question his former wife. The police did not arrest appellant but instead called in Project Respond staff to evaluate his behavior. Appellant told the Project Respond staff person that, if the police did not arrest him for menacing in order to give him a public trial in which to expose his former wife's shortcomings, he would take his complaints about her to The Oregonian. If the newspaper would not expose and humiliate his former wife, then he would take a hatchet to her home and kill her. Although appellant was calm, polite, and cooperative, he responded consistently in this vein over a 45-minute period at the police station to a range of questions about his intentions. The staff person from Project Respond drove appellant to Oregon Health & Science University Hospital, where he was admitted on a hold order.

Appellant consistently stated that he has no desire to harm his former wife, but he also repeatedly said that killing her might be the only option left to him. At his hearing, he

raised the topic of an aborted attempt that he had made in 1995 to kill her, when he also went by bus from Eugene to Portland. He explained that he made that attempt because a children's services agency had ignored his complaints about her behavior. He took a pick ax handle with him and slept overnight outside his family's house. He voluntarily abandoned the attempt when he realized that the children were awake, because he did not want to traumatize them. Appellant said that he felt "extremely conflicted" during the 1995 incident. He told the court, "I had no desire to kill her at the time, I simply felt it was necessary, the only remaining course." He expressed frustration that his latest actions led only to a commitment hearing and not a criminal trial where he could more fully air his grievances. He said that, although his children are now grown, he continues to feel that his wife exerts an unhealthy control over them that needs to be stopped.

The mental health examiners diagnosed appellant as having an untreated delusional disorder, persecutory type, and either a schizotypal personality disorder or schizophrenia. In the hope of questioning his children and his former wife during the hearing, appellant stipulated to the admission of letters that he had written to family members in 2003 and 2004. Those letters show that appellant has a tendency to suffer from delusions. All the experts describe appellant as presently experiencing "perseveration," which is the uncontrollable repetition of a response that has become inappropriate. *Stedman's Medical Dictionary* 1355 (27th ed 2000). In appellant's case, these repetitive responses include fixations on dealing with family events that occurred 10 to 20 years ago and, as he himself identified, on his 1995 murder plan. The examiners found appellant to be intelligent and to have organized, albeit illogical, thought processes that represent a persistent belief system. They agreed that he was capable of further organizing his thoughts to pursue the course of action that he had recently threatened.

Appellant denies that he has a mental disorder. He testified that he receives no mental health treatment and does not need any. At the time of the hearing, the only medication that he had been given in the hospital was a sleeping aid for insomnia. Appellant told the court that he wanted to

raise the truth of his assertions about the problems in his family as a "defense" to commitment. He believes that he and his former wife are, or have been, infected by a parasite and that she has brainwashed his children into considering him to be crazy.

Although appellant said that he had no objection to his hospital stay, which was very comfortable, his stated objective at the hearing was to be released. He said that, if released, he would return to the manner in which he had lived on his own for the past 15 years. He described himself as unable to stay inside buildings, and he had brought no money with him to Portland.

On appeal, appellant contends that the record to support the court's involuntary commitment order is lacking in two respects. He argues that it lacks evidence sufficient to support a finding by clear and convincing evidence that he presented a danger to others at the time of the hearing because he denied any present intention to harm another person and because the evidence showed no more than indirect verbal threats. Separately, he argues that the court failed to gather the evidence necessary to resolve whether he would voluntarily participate in treatment.

■ ■  We begin with the evidence bearing on whether appellant presented a danger to others at the time of the hearing. The state bears the burden to prove by clear and convincing evidence that a person is a danger to others as a result of "his condition at the time of the hearing as understood in the context of his history." *State v. King*, 177 Or App 373, 377, 34 P3d 739 (2001); *see also* ORS 426.130(1)(b) (stating standard of proof). Past acts—including "past verbal acts"—can justify a finding that a person is mentally ill as long as the acts "clearly form the foundation for predicting future dangerousness." *State v. Woolridge*, 101 Or App 390, 394, 790 P2d 1192 (1990). If that standard is met, specific acts of violence are not required to establish dangerousness. *State v. Bodell*, 120 Or App 548, 550, 853 P2d 841 (1993) (citing *State v. Pieretti*, 110 Or App 379, 383, 823 P2d 426 (1991), *rev den*, 313 Or 354 (1992)).

Here, the mental health experts agreed that, despite the apparent absence of any new stimulus in 2005, appellant was repeating at the time of the hearing the behavior cycle

that he had embarked on in 1995. Appellant himself introduced his past act or plan as evidence of his behavior and intent toward his former wife. Although he says that he has never had a desire or intent to harm his former wife, at times he feels that killing her is necessary. As an influence on appellant's immediate future behavior, the experts noted that he was undergoing the same frustration of purpose, because the police did not arrest him in 2005, that he had experienced when the children's services agency would not listen to him in 1995. In the context of his history and mental disorder, appellant's statement to the court that he did not want to harm his former wife may be true, but that does not mean that he does not present a danger to her. His rationalization of the need to take action, with a focus on plans to kill his former wife, directly contradicts that self-proclaimed lack of intent. As one medical examiner explained to the trial court, appellant "attempts to make his threat to kill his wife a perfectly sensible approach" and has "perseveration of grandiose thinking about his responsibility to kill his wife to [protect] his children." Although a mere recitation of past acts is insufficient, *State v. Lucas*, 31 Or App 947, 950, 571 P2d 1275 (1977), here, the extremely focused homicidal ideation that appellant wanted to discuss at his hearing is given context by the parallels found in his past acts or plans.

In addition to appellant's statements about his intentions, we must consider what appellant recently threatened, the parallels between his situation at the time of the hearing and the past acts that he claimed to have undertaken, and the experts' assessment of the implications of those facts. That evidence persuades us that appellant's organized but illogical thought processes made him an immediate danger to his former wife if he did not receive mental health treatment. Thus, we find that there is clear and convincing evidence that appellant was mentally ill at the time of the hearing by reason of the danger that he presented to another person.

We turn to the question whether the court erred by failing to gather evidence necessary to resolve whether appellant would voluntarily participate in treatment. Appellant argues that ORS 426.130(1)(b)(A) required the court to ask him at the hearing whether he would voluntarily participate in mental health treatment outside of a confined hospital setting. ORS 426.130(1)(b)(A) provides that the judge

"[s]hall order the release of the individual and dismiss the case if: (i) The mentally ill person is willing and able to participate in treatment on a voluntary basis; and (ii) The court finds that the person will probably do so." Nothing in the statutory language or the case law that has applied it supports an interpretation of the statute that would require a court to make a direct inquiry of the mentally ill person about his willingness to participate in treatment. As is the standard approach in evidentiary matters, the court's role as factfinder is to assess the weight of the evidence that is in the record.

■     Here, at the time of the hearing, appellant denied that he had a mental disorder and had no insight into his delusions or his irrational, obsessive thinking. In fact, he claimed the truth of his illogical assertions about his family as a defense to the state's efforts to provide him with mental health treatment. He stated clearly that he wished to be released in order to return to caring for himself in the manner that he had as a homeless person, that he could not comfortably stay inside buildings, and that he had no financial resources in Portland. In light of that evidence, we conclude that the trial court did not err in concluding that appellant would not voluntarily participate in the treatment of his mental disorder.

Affirmed.