Submitted December 4, 2008, reversed February 11, 2009

In the Matter of M. R.,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

M. R.,
*Appellant.*

Benton County Circuit Court
M060036; A132229

202 P3d 221

Susan D. Isaacs filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Rosenblum, Judge, and Sercombe, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

Appellant seeks reversal of an order adjudicating him to be a mentally ill person and committing him to the Mental Health Division. ORS 426.130(1)(b)(C). He asserts that the state failed to prove, by clear and convincing evidence, that, because of a mental disorder, he was a danger to himself or others or was unable to provide for his basic needs. ORS 426.005(1)(d).[1] On *de novo* review, *State v. O'Neill*, 274 Or 59, 61, 545 P2d 97 (1976), we reverse.

■      We review the facts as they existed on the date of the commitment hearing. *State v. Miller*, 198 Or App 153, 155, 107 P3d 683 (2005). On April 19, 2006, appellant, a student at Oregon State University (OSU), was hospitalized and held pursuant to a notice of mental illness after police at OSU responded to a complaint that appellant was "being a nuisance, harassing people, [and] hiding out." Appellant was trying to contact one of his former professors, McIntyre, at her office on the OSU campus. Appellant had wandered around the campus for 12 hours trying to find McIntyre, and (as recounted below) eventually had a brief encounter with McIntyre.

Appellant had approached McIntyre on the last day of class and started talking about "different things." Appellant's behavior was "very confusing and uncomfortable" to McIntyre but not threatening nor, at that time, did it cause McIntyre concern about her safety. Appellant later left McIntyre a note containing a "disturbing" story and sent her several e-mails, which McIntyre described as "strange." In those e-mails, appellant made statements such as "I thought for a lot of reasons that you wanted to be in a relationship with me as more than friends," and "I think we might need to talk tonight!"

Roughly a week before his encounter with McIntyre on April 19, appellant abruptly walked into the office that

---

[1] ORS 426.005(1)(d) provides, in part:

" 'Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:

"(A) Dangerous to self or others.

"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."

McIntyre shared with a teaching assistant, Faris, and stated that he was "looking for something." After being asked to leave, he returned to the office 15 minutes later and security was called. Faris testified that appellant smiled and did not seem angry or physically menacing.

On April 19, 2006, the day of appellant's hospitalization, McIntyre responded to appellant in an e-mail that he should "leave [her] alone" and that, if he did not stop trying to contact her, she would "have to report this to the appropriate authorities." Shortly after McIntyre sent that e-mail, however, appellant showed up at McIntyre's office and, with a big smile on his face, asked her if she wanted to "go for a ride."[2] Appellant then simply wandered away. After McIntyre shut the door, which automatically locked behind her, appellant came back and started wiggling the doorknob. Appellant then wandered off again. McIntyre notified the secretary, who called security.

McIntyre expressed fear and shock at appellant's behavior. What scared McIntyre was that she "had no idea what could happen. [Appellant's] behavior was so unpredictable. But the one constant is he seemed to keep coming back to me."

Dr. Jennifer Hamilton, one of appellant's treating psychiatrists, met with and observed appellant on April 20. Appellant was disorganized in his speech, difficult to follow, and rambling. Appellant expressed love for McIntyre and described a "special bond" and "close connection" with her. Hamilton diagnosed appellant with bipolar disorder, the same diagnosis appellant had been given during a prior admission to St. Vincent's Hospital in March 2006. According to Hamilton, appellant had a "fixation" on McIntyre that was "disturbing." In Hamilton's opinion, appellant's e-mails to McIntyre were not outwardly threatening, but "the fact that [appellant] does not accept boundaries that [McIntyre has] placed" on appellant is "disturbing." Hamilton expressed concern about what appellant might do if, at some point, it

---

[2] McIntyre testified that appellant would not have had time to receive the e-mail she sent him on April 19, 2006, before he knocked on her door.

occurred to him that he and McIntyre may never have a relationship. She explained that,

"if he is able to understand that she really doesn't have the same feelings for [him], it could certainly cause him to, I don't know. You know, anything could happen. He could decide that she should die, you know, who knows what could happen. I don't even want to theorize. But the fact that he has very little connection with reality right now means that he could pretty much do anything."

At appellant's mental commitment hearing, appellant's father testified that he was concerned that appellant will continue to contact, and perhaps endanger, McIntyre. The mental health investigator's report noted that appellant intends to attempt to contact McIntyre and ask her to marry him.

During his hospitalization, appellant continued to exhibit certain invasive behaviors. He often upset other patients by entering their rooms uninvited and on one occasion refused to leave the room of another patient. Although staff attempted to redirect him, he often would end up back in other patients' rooms within minutes.

There were also two instances in which appellant acted out against staff. Once, as a staff member was leaving and closing the door, appellant threw a water pitcher at the door. During the second incident, appellant took a haphazard swing at a staff security supervisor while he was attempting to redirect appellant. The security supervisor testified that appellant did not seem angry, was laughing, and did not really seem to intend to hurt him.

The trial court determined that, because of a mental disorder, appellant was a danger to himself and others, and was unable to provide for his basic needs. The court committed appellant to the Mental Health Division for a period of time not to exceed 180 days. ORS 426.130(1)(b)(C), (2).

On appeal, appellant does not challenge the trial court's conclusion that he has a mental disorder. Rather, he argues that the state did not present clear and convincing evidence that, because of his mental disorder, he is a danger to himself or others, or is unable to provide for his basic

needs. The state concedes on appeal that the record does not establish that appellant is either a danger to himself or incapable of providing for his basic needs. Although we are not bound to such a concession on appeal, it is well founded and we accept it. Thus, the relevant inquiry on appeal reduces to whether the state produced "clear and convincing" evidence, ORS 426.130(1)(b), that, because of his mental disorder, appellant is a danger to others.

■■ The clear and convincing evidence standard is a rigorous one, requiring "evidence that is of 'extraordinary persuasiveness,' and which makes the fact in issue 'highly probable.' " *State v. Allen*, 209 Or App 647, 652, 149 P3d 289 (2006) (quoting *State v. Hambleton*, 202 Or App 526, 533-34, 123 P3d 370 (2005)). That standard is "not merely abstract or precatory. Rather, [it is] the product of a fundamental recognition of 'the priority of preserving personal liberties in [civil commitment] cases.' " *Hambleton*, 202 Or App at 534 (quoting *State v. Lott*, 202 Or App 329, 354, 122 P3d 97 (2005), *rev den*, 340 Or 308 (2006) (Edmonds, P. J., dissenting)) (second brackets in *Hambleton*).

■■ In determining the sufficiency of the state's evidence under that standard, we assess whether the evidence presented was sufficient to prove that "a person is a danger to others as a result of 'his condition at the time of the hearing as understood in the context of his history.' " *State v. Lawrence*, 208 Or App 212, 216, 144 P3d 967 (2006) (quoting *State v. King*, 177 Or App 373, 377, 34 P3d 739 (2001)). Specific acts of violence are not required to establish dangerousness. *State v. Bodell*, 120 Or App 548, 550, 853 P2d 841 (1993). Rather, past acts—including "past verbal acts"—can also justify a finding that a person is mentally ill so long as the acts "clearly form a foundation for predicting future dangerousness." *State v. Woolridge*, 101 Or App 390, 394, 790 P2d 1192, *modified on recons*, 102 Or App 559, 794 P2d 1258 (1990); *see also State v. Pieretti*, 110 Or App 379, 383, 823 P2d 426 (1991), *rev den*, 313 Or 354 (1992) (determining that the appellant posed a danger to others when, although he had committed no overt violent acts against anyone, there was ample evidence to form a foundation for predicting that he would).

■ The state maintains that appellant's conduct, considered in its totality, constitutes a sufficient basis for predicting appellant's future dangerousness. In particular, the state points to, *inter alia*: (1) appellant's manic episode; (2) his fixation on a relationship with McIntyre, despite her repeated attempts to dissuade him from contacting her; (3) his continued expressed desire to have a relationship with McIntyre; (4) his family's and doctor's concerns that appellant might try to harm McIntyre if released; (5) his continued physically invasive behaviors; (6) appellant's act of throwing a water pitcher at a person in the hospital; and (7) his attempt to hit a security supervisor. The state further argues that, although no one was able to affirmatively state with certainty what appellant might do if released, "that is true in any case" and that, in light of appellant's continued obsession and "increasing violence," appellant "*could* decide that McIntyre should die." (Emphasis added.)

The state's argument is problematic, and ultimately unpersuasive. There is no evidence in the record that appellant has threatened to harm, let alone intends to harm, either McIntyre or anyone else. *Cf. Lawrence*, 208 Or App at 217 (affirming determination of "danger to others" based on the appellant's "extremely focused homicidal ideation" and recent threats to kill his wife); *Pieretti*, 110 Or App at 383 (affirming determination of "danger to others" based on the appellant's recent obscenities, vulgar sexual references to friends and family members, graphic threats to kill four people, and violent reactions when faced with everyday frustrations). Rather, appellant stated that he wanted to marry McIntyre, pursue contacting her, and have a relationship with her. Never in his e-mails, note, story, and statements to others about McIntyre did appellant ever mention harming McIntyre—or anyone else.

Conversely, any basis for predicting appellant's future dangerousness arises solely from others' speculation about what appellant *might* or *could* do. McIntyre stated she "had *no idea* what *could* happen" because appellant's "behavior was so unpredictable." (Emphasis added.) Appellant's father feared that appellant will "*perhaps* endanger [McIntyre]." (Emphasis added.) Hamilton expressed conclusions based only on what appellant might do, postulating

that "anything *could* happen," that appellant "*could* decide that she should die," and that appellant "*could* pretty much do anything." (Emphasis added.) We have long held, however, that such "[c]onclusions based on conjecture as to whether appellant poses a danger to others are insufficient." *Woolridge*, 101 Or App at 394; *see also State v. Fry*, 36 Or App 297, 301, 584 P2d 354 (1978) ("Apprehensions and speculation alone are not enough to fulfill the requirements of the statute.").

As for the incidents in the hospital with staff, the record, again, does not disclose any intent to harm. With respect to the "haphazard type swing" that appellant took at the staff security supervisor, the supervisor testified that appellant did not seem angry and did not really seem to intend to hurt him. Further, with respect to the incident in which appellant threw a water pitcher, the record does not disclose the context of that episode and, specifically, appellant's affect or the potential of the pitcher to inflict physical injury. Thus, neither episode, in context, "clearly form[s] a foundation for predicting future dangerousness." *Woolridge*, 101 Or App at 394; *cf. King*, 177 Or App at 378 (affirming determination of "danger to others" based on the appellant's reoccurring decompressions, the need for restraints during an episode in the hospital, and a nurse's testimony that the appellant's illness could cause him to strike out).

Certainly, appellant exhibited multiple invasive behaviors, including repeated unwanted contacts with McIntyre, entering professors' offices uninvited, and entering other patients' rooms uninvited. However, the record discloses that appellant's demeanor during these invasive behaviors was neither physically menacing nor threatening. Thus, although appellant's behavior may have been socially uncomfortable or unpleasing, it cannot properly be characterized as physically dangerous to others.

We emphasize that a civil commitment is not the mechanism to deal with uncomfortable or unwanted social behaviors, or even to protect an individual's right of privacy against persons exhibiting invasive or intrusive behaviors.[3]

---

[3] To be sure, in certain statutorily circumscribed circumstances, a person engaging in such behaviors may be subject to a stalking protective order (SPO).

Rather, civil commitments are reserved for the particular and distinct circumstances circumscribed by the legislature in which the state can present clear and convincing evidence that, because of a mental disorder, appellant meets one or more of the statutory requirements outlined in ORS 426.005(1)(d), *e.g.*, appellant is dangerous to others. *See State v. Pike*, 197 Or App 508, 515, 106 P3d 693 (2005) ("Involuntary commitment for a mental disorder constitutes a serious deprivation of personal liberty and cannot be imposed constitutionally solely to achieve desirable social goals * * *."). The state failed to establish those requisites here.

Reversed.

---

ORS 30.866. A mental commitment and an SPO each require unique and distinct elements. The elements required to obtain an SPO are described in ORS 30.866(1):

"A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

An SPO requires "repeated" contacts, meaning more than one contact. Additionally, speech-based contacts must constitute a threat. *State v. Rangel*, 328 Or 294, 303, 977 P2d 379 (1999). A threat, in turn, is a contact that "instills in the addressee a fear of imminent and serious personal violence from the speaker, is unequivocal, and is objectively likely to be followed by unlawful acts." *Id.*