235 P.3d 720 (2010)
236 Or. App. 186
In the Matter of A.M.R., Alleged to be a Mentally Ill Person.
STATE of Oregon, Respondent,
v.
A.M.R., Appellant.
300815461; A139503.
Court of Appeals of Oregon.
Argued and Submitted May 27, 2010.
Decided July 7, 2010.
*721 James A. Palmer, Eugene, argued the cause and filed the brief for appellant.
Matthew J. Lysne, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.
Before HASELTON, Presiding Judge, and ARMSTRONG, Judge, and DUNCAN, Judge.
HASELTON, P.J.
Appellant seeks reversal of an order adjudicating her to be a mentally ill person and committing her to the Mental Health Division. ORS 426.130(1)(b)(C).[1] Appellant *722 challenges the trial court's findings that, at the time of the hearing, she presented a danger to herself and others, and that, although she was able to provide for her basic needs, she was not receiving such care as was necessary for her health and safety. See former ORS 426.005(1)(d) (2007), renumbered as ORS 426.005(1)(e) (2009).[2] We review de novo, State v. O'Neill, 274 Or. 59, 61, 545 P.2d 97 (1976),[3] and reverse.
We review the facts as they existed on the date of the commitment hearing. State v. Miller, 198 Or.App. 153, 155, 107 P.3d 683 (2005). In July 2008, Junction City Police Sergeants Larson and Salsbury responded to a call at the boarding house where appellant lived. When Salsbury arrived, he could hear appellant "yelling and cussing" upstairs, as if she was arguing with someone.
Larson and Salsbury went upstairs to speak with appellant and found her in her room alone. Larson asked appellant with whom she was arguing, and appellant told him that she was "talking to herself and that's what she does." During the ensuing conversation, appellant told Larson that an "Officer Salsbury" had threatened to shoot her and "use her for target practice," and asked whether the officers were going to use her cat for target practice. Appellant then walked into the hallway, where Salsbury was standing, and said that she needed to find her cat. She told Salsbury that "Officer Salsbury had threatened to shoot her and use her for target practice" and asked whether he was like him.[4]
At that point, Larson told appellant that "she was going to have to go with us to the [h]ospital." Appellant started to scream and yell at the officers, assumed a "defensive posture," and said, "No, I am not going to go." The officers told appellant that she was "under arrest for a police officer hold" and, overcoming her resistance, grabbed her arms and wrists and placed her in handcuffs.
Appellant continued to struggle against the officers as they attempted to take her down the stairs to the patrol car. During the struggle, appellant kicked, striking Salsbury's shin, and spit and tried to bite him. At the patrol car, the officers used a "hobble" to restrain appellant's legs and put a "spit hood" over her face. The officers then forced appellant into the patrol car. When Salsbury tried to secure the hobble in the back of the patrol car, appellant bit his left shoulder.
Larson transported appellant to Sacred Heart Medical Center, where she was placed on an involuntary mental health hold. While in the hospital, appellant was interviewed by the precommitment investigator. According to the precommitment investigator, appellant appeared delusional and her tone of voice was "hostile" throughout that interview. Appellant was also interviewed by the examiner, who observed that appellant's mood was volatile and switched from "being quiet and rather apologetic to being loud and angry the next moment." At one point in the interview, appellant suddenly slammed her hands down on the table and shouted at the examiner. The examiner also observed appellant slam a door "rather loudly" after a later, private consultation between appellant and her attorney.
At the commitment hearing, Salsbury testified, as described above, about his encounter with, and observations of, appellant. In addition, appellant's treating psychiatrist testified that appellant has a bipolar disorder and was "manic with psychotic features." She also rendered the opinion that appellant was a danger to herself and others as a *723 result of her mental disorder. The psychiatrist did not offer any personal account as to why appellant posed a danger to others. However, she did refer to the report of another doctor, which stated that appellant had "nearly assaulted" him in the emergency room. That account, however, was included in hearsay portions of the report that the trial court had previously excluded from evidence.
Appellant's testimony at the commitment hearing was tangential and rambling. In general, it consisted of an account about how the police had failed to come to her aid when she needed assistance, and her complaints about how the officers, medical staff, and others had threatened, harassed, or mistreated her. Appellant also acknowledged that she tried to bite Salsbury, but denied spitting on him or kicking him. Appellant further acknowledged that she refused to take medications for her disorder.
At the end of the hearing, the examiner recommended that appellant be committed on the grounds that she was suffering from a mental disorder and was a danger to herself and to others, and because, although she was able to provide for her basic personal needs, she was "not now receiving such care as is necessary for * * * her health or safety." The trial court rendered findings consistent with the examiner's conclusions and, accordingly, committed appellant to the Mental Health Division for a period of time not to exceed 180 days. ORS 426.130(1)(b)(C), (2).
On appeal, appellant does not challenge the trial court's conclusion that she has a mental disorder. Rather, she argues that the state failed to present clear and convincing evidence that, as a result of that disorder, she was a danger to herself and others, and that she was not receiving the care necessary for her health and safety. The state does not dispute that the record does not support the trial court's determination that appellant is a danger to herself. We agree and accept that concession as well founded. Further, the state does not assert that the evidence demonstrates that appellant's mental disorder renders her unable to provide for basic personal needs. Accordingly, our inquiry narrows to whether there is clear and convincing evidence that appellant was a danger to others.
In that regard, appellant contends, inter alia, that her forcible resistance to the officers' efforts to arrest her and take her to the hospital, without more, is insufficient to establish that she is a danger to others. The state responds that appellant's history of hostility towards others, coupled with her kicking and biting Salsbury during her arrest, provided a sufficient evidentiary basis from which the trial court could predict future dangerousness. For the following reasons, we agree with appellant.
The state had the burden of proving, by clear and convincing evidence, that appellant is a danger to others. ORS 426.130(1)(b). As our cases have repeatedly emphasized, that standard is a rigorous one, requiring that the state present evidence that "is of extraordinary persuasiveness and which makes the fact in issue highly probable." State v. M.R., 225 Or.App. 569, 574, 202 P.3d 221 (2009) (internal quotation marks omitted).
In determining whether a person poses a danger to others, we assess whether the evidence presented "was sufficient to prove that `a person is a danger to others as a result of his condition at the time of the hearing as understood in the context of his history.'" M.R., 225 Or.App. at 574, 202 P.3d 221 (quoting State v. Lawrence, 208 Or.App. 212, 216, 144 P.3d 967 (2006)). The state may rely on past violent acts to show future dangerousness so long as "there is no indication that such violence is an isolated occurrence." Miller, 198 Or.App. at 158, 107 P.3d 683 (internal quotation marks omitted). However, "a mere recitation of past acts, in the absence of a showing that such [conduct] clearly forms the foundation for a prediction of future dangerousness, cannot serve as the basis for a finding that one" is dangerous to others. State v. Lucas, 31 Or.App. 947, 950, 571 P.2d 1275 (1977).
The circumstances in Miller are analogous to those here. In Miller, the only evidence of violence presented at the civil commitment hearing was testimony that the appellant had reacted violently when, after she refused to *724 come out from behind some bushes in her backyard, at least three police officers encircled her and forcibly brought her out. 198 Or.App. at 155-56, 107 P.3d 683. The appellant struggled against the officers, leaving two officers with scratches and bruises, and hit one officer in the arm with a cane. Later, at the hospital, the appellant also resisted the officers' attempts to bring her inside. Id. at 156, 107 P.3d 683. At the commitment hearing, the state offered no expert mental health testimony predicting the appellant's future dangerousness. Id. at 158, 107 P.3d 683. Additionally, there was nothing about the appellant's testimony at the hearing that indicated that she was threatening or violent. Id. Given those circumstances, we concluded in Miller that the state had not met its burden of adducing clear and convincing evidence that the appellant was dangerous to others:
"Although [one of the officers] testified that she and the other officers were trying to help appellant, she also testified that the way in which they tried to help appellant was to encircle her and try to grab hold of her and forcibly remove her from her backyard. Appellant's actions appear to have been in response to an unusual and threatening situation. As noted, the state produced no expert testimony or other evidence that the incident was not an isolated episode or that it `clearly forms the foundation for a prediction of future dangerousness.' The mere recitation of that incident, without more, cannot serve as basis for concluding that appellant has a propensity to react violently to those who try to help her or that there is a high probability that she will commit a violent act in the future."
Id. at 159, 107 P.3d 683.
So too here. Although appellant was "yelling and cussing" when the officers arrived, there was no evidence that she had acted out violently towards anyone at the boarding house. Indeed, when the officers found appellant, she was alone in her room, having an argument with just herself. Appellant reacted physically only when the officers, whom she believed may have wanted to use her or her cat for "target practice," forcibly attempted to handcuff her and take her to the patrol car. In short, appellant's actions towards the officers, including kicking and biting Salsbury, appear to have been an isolated response to "an unusual and threatening situation," and, accordingly, fail to "clearly form[ ] the foundation for a prediction of future dangerousness." Miller, 198 Or.App. at 159, 107 P.3d 683 (internal quotation marks omitted).
As noted, the record also includes the psychiatrist's and the examiner's conclusions that appellant posed a danger to others. Although it is proper for a court to consider the testimony of mental health experts, "[t]he bare conclusion[s]" of such experts, not supported by facts, are insufficient to support commitment. State v. Allen, 209 Or.App. 647, 653, 149 P.3d 289 (2006). Here, the psychiatrist's and the examiner's conclusions are not substantiated by evidence in the record and, consequently, do not satisfy the clear and convincing evidence standard.
The state remonstrates that we should also consider the fact that, because appellant continued to display volatile and hostile behavior in the hospital, and because she refused to take medications that could potentially ameliorate that behavior, the evidence supported the conclusion that appellant's "propensity for aggressiveness and violence predictably would continue." As noted, the nonhearsay portions of the record disclosed that, while appellant was hospitalized before the hearing, her tone of voice during the interview with the precommitment investigator was "hostile" and her conduct during an interview with the examiner was volatile, with appellant, at one point, slamming her hands on the table and shouting at the examiner. Given the rigors of the clear and convincing evidence standard, we cannot say that that conduct is so "extraordinar[ily] persuasive[]" that it makes the prospect that she posed a danger to others "highly probable." M.R., 225 Or.App. at 574, 202 P.3d 221.
Reversed.
NOTES
[1] ORS 426.130 was amended in 2009. Or. Laws 2009, ch. 595, § 393. Those amendments do not affect our analysis.
[2] Former ORS 426.005(1)(d) provided, in part:

"`Mentally ill person' means a person who, because of a mental disorder, is one or more of the following:
"(A) Dangerous to self or others.
"(B) Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety."
[3] The notice of appeal in this case was filed before June 4, 2009, the effective date of the modifications to ORS 19.415, which give the Court of Appeals discretion as to whether it exercises de novo review. Or. Laws 2009, ch. 231, § 3. For that reason, we rely on the 2007 version of the statute.
[4] It became apparent during that conversation that appellant, who had met Salsbury once before, did not recognize him.