AOYAGI, J., *705 Appellant seeks reversal of an order committing her involuntarily to the Oregon Health Authority for up to 180 days. Appellant contends that the trial court erred because the evidence in the record was insufficient to establish that she was dangerous to others due to a mental disorder. See ORS 426.130(1)(a)(C) ; ORS 426.005(1)(f)(A). We agree with appellant and, accordingly, reverse.
Unless we exercise our discretion to review de novo , which we do not in this case, we "view[ ] the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." State v. L. R. , 283 Or. App. 618, 619, 391 P.3d 880 (2017) ;
*1199 see also State v. S. R. J. , 281 Or. App. 741, 748-49, 386 P.3d 99 (2016) ("Whether the evidence of danger is legally sufficient to support a determination that appellant is 'dangerous' for purposes of ORS 426.005(1) is a determination that we review as a matter of law.") We state the facts in accordance with that standard of review.
Appellant suffers from bipolar disorder with psychotic features. Her primary caregiver and sole support is D, to whom she was married for 22 years until their divorce in 2007. Appellant has continued to live with D since their divorce.
Appellant stopped taking her medications in April 2017. Several months later, around August 1, D told appellant that she should go to bed. It was around 2:00 or 3:00 a.m., and appellant had been sitting in a chair for almost 24 hours. To facilitate her going to bed, D removed a number of religious statues from the top of appellant's bed, wrapped them in a blanket, and threw them on the floor. When appellant went in the bedroom and saw what he had done, she "went bonkers." According to D, "[s]he told me I attacked St. Anthony and I was going to hell, and she was going to kill me, and she went up to the fireplace, grabbed a poker and raised it over her head like that and was actually coming after me." D was in a recliner, so he could not back up, and "[i]t was scary." Appellant was about four feet in *706 front of him, and the poker was two-and-a-half to three feet long. D thought that appellant was actually going to hit him, but, "at the last minute," D grabbed a large brass lamp from the side table, and appellant backed off. Appellant calmed down after about five minutes and put the poker down. It was "pretty scary," and D thought about calling the police. He did not, because, within five minutes, appellant started laughing and was back to being "jovial, nice, [and] friendly."
Appellant was subsequently brought to the hospital for other reasons (not described in the admitted evidence), which led to a commitment hearing that took place on August 15. Appellant was verbally disruptive throughout the hearing, including constantly interrupting the witnesses, the attorneys, and the judge, and frequently insulting them.[1] Appellant, who has no children, repeatedly referenced her (delusional) belief that she had a "little boy" at home who was starving and needed her to bring him food and water. Early in the hearing, in the midst of appellant insisting that she needed to get home to feed her little boy, the court noted on the record that appellant (who was shackled) had attempted to leave the room in a "fairly aggressive" manner. Later, appellant's fixation seemed to shift to Australia, and she repeatedly referenced the population of Australia in her outbursts.
The state called three witnesses: Gida, D, and McAlexander. Gida, a mental health therapist and the pre-commitment investigator, testified that appellant has a diagnosis of bipolar disorder with psychotic features. Gida met appellant once, on August 9, and tried to interview her with limited success. For her investigation, Gida reviewed past reports, met with appellant's case manager, spoke with D, and spoke with nurses and the mental health therapist at the hospital where appellant was initially transported. Based on her investigation, Gida understood appellant's presentation in court to be "how she's been presenting all along." Gida described appellant's symptoms as including elevated mood, agitation, lack of insight, lack of impulse control, response to internal stimuli, preoccupation, and *707 a delusional belief that she has a little boy at home. After explaining in some detail why she believed that appellant was dangerous to herself, Gida was asked whether appellant was dangerous to others. Gida answered, "I believe so." When asked why, she cited, without elaboration, "the reports from [D]," appellant being "very unpredictable," and the "aggressiveness and the agitation" displayed at the hearing. Gida opined that any dangerousness to self or others was caused by appellant's mental disorder.[2] *1200 The next witness was D. D briefly described his relationship with appellant and explained that she was living with him before her hospitalization. She had her own bedroom and bathroom. D had been appellant's "sole support," as her family lived in Australia. He had given appellant her medications and taken care of her food, clothing, and basic needs. Appellant was fine when taking medication and had gone as long as five and a half years without hospitalization. However, appellant had been refusing her medications since April. D had seen appellant go off her medications approximately 20 to 24 times in the past 20 years, and she had been hospitalized about the same number of times. When appellant was off her medications, she lost her appetite, hardly slept, talked to voices that were not there, and "[went] from very angry to laughing hysterically within less than a minute." She would be manic most of the time-happy and in a good mood-but then, "in a minute, she'[d] flash and just go angry," and whoever happened to be nearby would "get[ ] the brunt of it." Appellant's recent behavior (relative to the hearing) was similar to prior times that she had been hospitalized. The only time that D had seen her worse was once when she had peeled the skin off her cheeks while hearing voices.
Asked whether appellant had "been violent towards [him] recently," D described the incident with the fireplace poker. According to D, that incident was "pretty scary" because "she just lost it there for a few minutes." D was not asked whether appellant had historically engaged in *708 violence or threats towards him or anyone else, and he did not mention any other incidents of violence or threats.
The last witness was McAlexander, a psychiatric-mental health nurse practitioner, who testified that she had been working with appellant for a little under two years and saw her once a month. She testified that appellant has bipolar disorder with psychotic features. Her symptoms include elevated mood, lack of impulse control, elevated speech, inability to sleep, and at-risk behaviors. After explaining why she believed that appellant was dangerous to herself, McAlexander was asked about the likelihood of appellant being dangerous to others. She answered, "I think that's also a high risk as well. I think past history, recent history..." McAlexander did not finish that sentence. McAlexander opined that any dangerousness was a direct result of appellant's mental disorder.
At the conclusion of the testimony, the state said that it would like to make note of appellant's behavior during the hearing, and the court stated for the record that it was apparent during the hearing that appellant was "responding to internal stimuli, as described by the witnesses," and that she had provided a running commentary throughout the hearing, as the transcript would reflect.
The trial court found that appellant had a mental disorder. It found that appellant was not dangerous to herself, nor was she unable to care for her basic needs.[3] It found that she was dangerous to others, however, "based on the incident with the fire poker," in conjunction with her observed behavior in court, which the court described as "about as out of control as I've seen anyone." The court acknowledged that there was only the "one incident" and that it was a "closer call than someone might guess just by observing what occurred here in court today." It explained that, although "common sense says [appellant] needs some hospitalization," "[c]ommon sense isn't the law, but I think *709 the dangerous to others gets us there." The court therefore determined that appellant had mental illness, within the meaning of ORS 426.130(1)(a) and ORS 426.005(1)(f)(A), and committed her to the Oregon Health Authority for a period not to exceed 180 days.
Appellant appeals. In her sole assignment of error, she contends that the trial court erred in determining that she was a person with mental illness within the meaning of the civil commitment statutes, specifically that she was dangerous to others as a result of her mental disorder.
*1201 ORS 426.130(1)(a)(C) allows the trial court to commit a person to the Oregon Health Authority, for a period up to 180 days, if the court determines that the person has "mental illness" and is in need of treatment. The determination of mental illness must be "based upon clear and convincing evidence." ORS 426.130(1)(a). "That standard of proof is a rigorous one, requiring evidence that is of extraordinary persuasiveness, and which makes the fact in issue highly probable." State v. J. T. C. , 284 Or. App. 38, 39, 392 P.3d 754, rev. den. , 361 Or. 645, 398 P.3d 42 (2017) (citation omitted). The standard is rigorous because of the "strong personal and liberty interests at stake" in involuntary commitment. State v. D. M. , 245 Or. App. 466, 471, 263 P.3d 1086 (2011).
A "person with mental illness" includes someone who, "because of a mental disorder," is "dangerous to * * * others." ORS 426.005(1)(f)(A). Dangerousness to others is determined based on the person's "condition at the time of the hearing as understood in the context of [her] history." State v. D. L. W. , 244 Or. App. 401, 405, 260 P.3d 691 (2011) (citation omitted). "[C]onclusions based on conjecture as to whether appellant poses a danger to others are insufficient." State v. M. R. , 225 Or. App. 569, 576, 202 P.3d 221 (2009) (citation omitted). "[A]ctual future violence" must be "highly likely." State v. M. A. , 276 Or. App. 624, 629, 371 P.3d 495 (2016).
Dangerousness to others may be established by a pattern of overt acts of violence by a person with a mental disorder, including escalating violence. D. L. W. , 244 Or. App. at 405, 260 P.3d 691. However, "[e]ven evidence of past violent acts must provide a foundation to predict future dangerousness, not *710 merely describe past isolated incidents." L. R. , 283 Or. App. at 625, 391 P.3d 880. A single act of violence is sufficient to establish danger to others only if it provides that foundation and "there is no indication that such violence is an isolated occurrence." State v. A. M. R. , 236 Or. App. 186, 191, 235 P.3d 720 (2010). As for threats, current threats of violence by someone with a mental disorder who has "carried out an overt violent act in the past against another person" are typically sufficient to establish dangerousness to others, while "[m]ere verbal threats of violence made in the past are generally insufficient" to do so. D. L. W. , 244 Or. App. at 405, 260 P.3d 691.
In this case, there is no question that appellant has a mental disorder. Appellant does not contest that finding, and there is overwhelming evidence to support it, including her extremely disruptive behavior at the commitment hearing. However, " ORS 426.005 precludes a court from committing a person on the basis of a mental disorder alone." State v. S. D. M. , 198 Or. App. 153, 161, 107 P.3d 683 (2005). Civil commitment seriously impinges on a person's liberty, and we have repeatedly stated that it cannot be used as "a paternalistic vehicle for saving people from themselves." State v. White , 155 Or. App. 288, 294, 963 P.2d 107 (1998) (internal quotation marks omitted). We therefore must grapple with the same reality that the trial court acknowledged: No matter how obvious it might seem that appellant needed treatment for her mental disorder at the time of the hearing (at which point she had been off her medications for four months) and would benefit from treatment, we must adhere to the rigorous legal standards for involuntary commitment. Doing so, we conclude that the record was legally insufficient to support the trial court's determination that appellant was dangerous to others, due to her mental disorder, at the time of the hearing.
In determining that appellant was dangerous to others, the trial court relied on two things: the "fire poker" incident, and appellant's behavior at the hearing. See State v. D. L. , 202 Or. App. 329, 335, 122 P.3d 97 (2005), rev. den. , 340 Or. 308, 132 P.3d 28 (2006) ("[I]t is appropriate for a court to consider the testimony of mental health experts, the person's past acts, and the person's apparent condition at the time of the hearing."). We address each in turn.
*711 The incident with the fireplace poker was a threat of serious physical violence (telling D that she was going to kill him) coupled with an overt act of violence (coming at D with the poker raised). D, who knows appellant well, believed that appellant truly intended to strike him, until he raised a brass lamp at the last moment and she backed off.
*1202 Although appellant did not actually swing the poker or strike D, D's description of the incident was sufficient to establish an express threat of serious physical harm accompanied by an overt act of violence.
Yet, on this record, the fireplace poker incident appears to be a classic example of an "isolated occurrence" of violence. A. M. R. , 236 Or. App. at 191, 235 P.3d 720. There is no evidence of appellant ever engaging in any other violent acts against D or anyone else, or of appellant threatening D or anyone else, at any other time. D testified that appellant had gone off her medications many times over the past 20 years, and, other than the fireplace poker incident, he did not describe a single incident of violent or threatening behavior by appellant. There is no way to know whether that was because there have been none, or because the record was inadequately developed, but, either way, there is no evidence of other violence or threats in the record.
As for appellant's conduct at the commitment hearing, there is abundant evidence that appellant was "out of control," in the trial court's words, as far as being disruptive. It is readily apparent from the transcript that appellant was unable to stop herself from constantly interrupting the witnesses, the attorneys, and the judge, including to insult them. Gida testified that such behavior was a symptom or manifestation of appellant's mental disorder. The question is whether it also provided sufficient evidence to demonstrate that the fireplace poker incident was not an isolated occurrence.
We conclude that it did not. Being verbally disruptive and rude as the result of an untreated mental disorder was not sufficient, at least in these circumstances, to establish that "actual future violence" was "highly likely." M. A. , 276 Or. App. at 629, 371 P.3d 495. The state points to the fact that appellant, who was shackled, once tried to leave the hearing *712 room "in a fairly aggressive fashion," apparently to try to get home to her (non-existent) starving child. The record says nothing about what appellant actually did, however, and that statement is too ambiguous to meaningfully factor into the analysis. See also S. R. J. , 281 Or. App. at 754-55, 386 P.3d 99 (discussing limited significance of a person with a mental disorder resisting "forcible interference with her body" by police or security as evidence of dangerousness to others).
We have recognized the limited utility of fact-matching in civil commitment cases-especially because older cases apply a de novo standard of review that we rarely apply now-but our decision in A. M. R. , 236 Or. App. at 186, 235 P.3d 720, bears mentioning. In that case, there was evidence that the appellant, who also was diagnosed with bipolar disorder with psychotic features, had been "yelling and cussing" when officers arrived to transport her, had been "hostile" in an interview with the pre-commitment investigator, had been "volatile" in an interview with the examiner, and refused to take medications. Id . at 188-89, 193, 235 P.3d 720. At the commitment hearing, her speech was "tangential and rambling." Id . at 190, 235 P.3d 720. The trial court committed her based on a finding that she was dangerous to others due to a mental disorder. We reversed, stating, "Given the rigors of the clear and convincing evidence standard, we cannot say that that conduct is so extraordinarily persuasive that it makes the prospect that she posed a danger to others highly probable." Id . at 193, 235 P.3d 720 (internal quotation marks and alteration omitted; emphasis added).
To summarize, with respect to appellant's dangerousness to others, the evidence in this case consists of one isolated incident of near-violence by appellant against her primary caregiver, while angry that he had disrupted some religious statues on her bed. Although that incident was serious, there was no evidence that it was part of a larger pattern of violence. There was no evidence of any other act of violence or any other threats against anyone at any time during the long history of appellant's mental disorder, including on any of the many prior occasions when she had stopped taking medications. Appellant's conduct during the commitment hearing was extremely disruptive, but there *713 is no record of her having done anything violent or threatening. Nor is there anything else in the record to suggest that, in context, the fireplace poker incident was indicative of future dangerousness, rather *1203 than being an isolated incident. A past violent act "must provide a foundation to predict future dangerousness," not merely have occurred, to support a determination that a person is dangerous to others due to a mental disorder. L. R. , 283 Or. App. at 625, 391 P.3d 880 ; see also M. A. , 276 Or. App. at 629, 371 P.3d 495 (issue is whether "actual future violence" is "highly likely"). On this record, the evidence was insufficient for the trial court to find, by clear and convincing evidence, that appellant was dangerous to others.
Reversed.

Appellant's insults were quite offensive but not violent or threatening in nature.

We note that Gida's report was admitted into evidence, but hearsay statements in the report (some of which she repeated in her testimony) were admitted only to explain the basis of her opinion, not for the truth of the matter asserted.

The state argued for commitment on all three grounds-danger to self, danger to others, and inability to provide for basic needs-and all three witnesses answered questions about all three grounds. Because the court committed appellant based solely on her being dangerous to others, and that determination is the only issue before us on appeal, we have limited our description of the evidence to that issue.