Submitted June 17, affirmed August 4, 2021

In the Matter of S. E.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

S. E.,
*Appellant.*

Multnomah County Circuit Court
20CC03398; A174219

496 P3d 1140

Appellant seeks reversal of a judgment involuntarily committing her to the Mental Health Division for up to 180 days and an order prohibiting her from purchasing or possessing firearms. On appeal, appellant argues that the evidence was insufficient to prove that she suffered from a mental disorder that makes her dangerous to herself or others. *Held*: A rational finder of fact could have permissibly inferred from appellant's behavior, symptoms, lack of willingness to take recommended medication, lack of insight into her condition, and impaired judgment that she was highly likely to engage in future violence toward others absent commitment. Thus, the evidence was legally sufficient to support the trial court's determination that appellant was a danger to others within the meaning of ORS 426.005(1)(f)(A).

Affirmed.

Heidi H. Moawad, Judge.

Alexander C. Cambier and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Carson L. Whitehead, Assistant Attorney General, filed the brief for respondent.

Before Tookey, Presiding Judge, and Aoyagi, Judge, and Hadlock, Judge pro tempore.

TOOKEY, P. J.

Affirmed.

**TOOKEY, P. J.**

Appellant seeks reversal of a judgment involuntarily committing her to the Mental Health Division for up to 180 days and an order prohibiting her from purchasing or possessing firearms, arguing that the evidence was insufficient to prove that she suffered from a mental disorder that makes her dangerous to herself or others. *See* ORS 426.130(1)(a)(C), (D), (2); ORS 426.005(1)(f)(A). We conclude that the record contains legally sufficient evidence to support the trial court's determination that appellant was a danger to others within the meaning of ORS 426.005(1)(f)(A). Therefore, we affirm.[1]

Unless we exercise our discretion to review an order of civil commitment *de novo* (which we do not here), "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *State v. M. J. F.*, 306 Or App 544, 545, 473 P3d 1141 (2020) (internal quotation marks omitted). We state the facts in accordance with that standard.

Appellant had been diagnosed with bipolar disorder. Appellant believed that her husband was "having an affair" with their neighbor; believed that her husband had stolen her identity and filled prescriptions in her name; and was afraid that her husband was trying to "take her child from her."

Shortly before the involuntary commitment hearing in this case, appellant had two interactions with her neighbor that were "shocking" to her neighbor. First, while appellant's neighbor was outside with the neighbor's dog at 11:30 p.m., appellant attempted to take the neighbor's dog from the neighbor when the neighbor would not go to appellant's backyard with appellant, telling the neighbor that she

---

[1] Because we conclude that the record contains legally sufficient evidence to support the trial court's determination that appellant was a danger to others within the meaning of ORS 426.005(1)(f)(A), we do not consider whether the record contains legally sufficient evidence to support the trial court's determination that appellant was a danger to herself within the meaning of ORS 426.005(1)(f)(A).

could return in an hour to retrieve her dog. Second, the next day, while appellant's neighbor was outside walking her dog, appellant accused her neighbor of being there to see her husband, grabbed her neighbor, and said, "Let's go." Her neighbor said, "I'm not going anywhere with you."

The following day, appellant had left her house (through the front door) and reentered into her bedroom (through the bedroom window). Appellant's husband heard her voice from the bedroom and entered the bedroom. Appellant had a hammer in her hand and said to him, "I think it's time for you to leave."[2] She was holding the hammer high and started coming toward her husband, who closed the bedroom door and held it closed. Appellant then started hitting the doorknob with the hammer, denting the doorknob. When there was a pause hammering, appellant's husband opened the door, grabbed appellant's wrists, and "pried" the hammer out of appellant's hands. Appellant's husband then tried to restrain appellant, but after she started "screaming and yelling" he "let her go" and she ran back out of the house "claiming that the cops were going to arrest [appellant's husband] because [he] beat her." Appellant's husband called the police, and appellant was arrested.

Subsequently, a friend brought appellant to the hospital. Since being hospitalized, appellant has consistently taken an antipsychotic medication but declined to take a mood stabilizer recommended by her physician. Appellant also has told her physician "numerous times" that she has violent thoughts whenever she thinks of her husband and her neighbor and that she thinks about poking her husband and her neighbor's eyes out with chopsticks. And, when asked about "homicidal ideation," appellant mentioned her neighbor.

Additionally, while hospitalized, appellant "postured" at a nurse; it "seemed like she was going to strike" the nurse. As a result, appellant was placed in seclusion. While in seclusion, appellant was not "able to regulate her emotions enough" and "continued to yell and bang on the door enough that she required intramuscular emergent

---

[2] Appellant's husband described the hammer as a "small household hammer," "standard issue," not the "ball-peen kind."

medication to regulate her behavior." She also inappropriately touched another patient who had an "intellectual developmental delay," which required appellant to be moved to a different unit in the hospital.

During the commitment hearing in this case, a physician who had interacted with appellant since her hospitalization testified that appellant's "insight and judgment [were] impaired in terms of her ability to interpret what's going on in her environment," which "increases the risk of her acting out on her delusions." The physician noted that appellant, while hospitalized, consistently stated that she did not believe that she had a diagnosis of bipolar disorder, although the morning before the commitment hearing she said that she does agree she has bipolar disorder but disagreed with the treatment the physician proposed. The physician also testified that appellant had been, at times, unable to "create a coherent story as to what happened before she was in the hospital or events that have occurred * * * in the hospital" and that, while in the hospital, appellant had been experiencing insomnia, reckless and thoughtless behavior, and grandiosity.

Appellant, for her part, testified during the commitment hearing that she is "not a violent person," but when you "threaten" to take her child away she "sees red." She also testified that she agreed that the testimony during the commitment hearing reflected that her behavior had been "impulsive and disinhibited and unpredictable," and she agreed that that behavior "puts other people at risk of harm."

At the end of the commitment hearing the trial court stated that its task was not to consider individual incidents alone but, rather, the evidence as a whole. It determined that appellant had "poor insight and judgment into her situation" and that appellant is "clearly under a highly stressful situation right now that is causing * * * the mania and psychosis." The trial court noted appellant's "disinhibited behavior while hospitalized, requiring seclusion and chemical restraint"; that at times appellant has been "unable to regulate herself at all"; appellant's inability to regulate herself during courtroom proceedings; and that

during courtroom proceedings appellant had become "quite agitated."

Ultimately, the trial court determined that appellant suffered from a mental disorder and was dangerous to herself and others. In particular, the trial court determined that appellant was "a danger to others because of the specific threat she made with the hammer, as well as the * * * threat regarding poking out the eyes of her husband and neighbor with chopsticks." The trial court entered a judgment committing appellant to the Mental Health Division for a period not to exceed 180 days.

As noted above, on appeal, appellant argues that the evidence was insufficient to prove that she suffered from a mental disorder that makes her dangerous to herself or others.

Under Oregon law, a person may be involuntarily committed if the person is determined to be a "person with mental illness." ORS 426.130(1)(a)(C). A "person with mental illness" is someone who suffers from a "mental disorder" and, as a result of that disorder, is "[d]angerous to self or others." ORS 426.005(1)(f)(A). For purposes of ORS 426.005(1)(f)(A), a person is dangerous to others if her

> "mental disorder makes [her] highly likely to engage in future violence toward others, absent commitment. That determination is based on the person's condition at the time of the hearing as understood in the context of [her] history. Further, conclusions about appellant's dangerousness based on conjecture are not enough; actual future violence must be highly likely. Evidence of past violent acts must provide a foundation to predict future dangerousness, not merely describe past isolated incidents."

*State v. E. J. J.*, 308 Or App 603, 612, 479 P3d 1073 (2021) (internal citation, quotation marks, and brackets omitted).[3]

---

[3] Additionally, ORS 426.130(1)(D) provides that the court

"[s]hall order that the person be prohibited from purchasing or possessing a firearm if, in the opinion of the court, there is a reasonable likelihood the person would constitute a danger to self or others or to the community at large as a result of the person's mental or psychological state as demonstrated by past behavior or participation in incidents involving unlawful violence or threats of unlawful violence, or by reason of a single incident of extreme, violent, unlawful conduct."

In view of "the clear-and-convincing-evidence standard of proof that applies in civil commitment proceedings, the question for us as the reviewing court is whether a rational factfinder could have found that it was highly probable that appellant was a danger to *** others because of a mental disorder." *State v. S. A. R.*, 308 Or App 365, 366, 479 P3d 618 (2021) (internal quotation marks omitted).

Although this is perhaps a close case, viewing the record in the light most favorable to the trial court's determination, as we must, *State v. T. T.*, 293 Or App 376, 384, 428 P3d 921, *rev den*, 364 Or 209 (2018), we conclude that the record contains legally sufficient evidence to support the trial court's determination that appellant was a danger to others within the meaning of ORS 426.005(1)(f)(A).

The record contains evidence that appellant held certain, untrue beliefs about her husband and neighbor; acted strangely toward her neighbor, attempting to take the neighbor's dog and the next day grabbing the neighbor; had violent thoughts concerning her husband and neighbor, *i.e.*, thoughts of poking her husband's and her neighbor's eyes out with chopsticks; mentioned her neighbor in connection with homicidal ideation; "postured" at a nurse in a manner that seemed like she was going to strike the nurse; required "chemical restraint" due to inability to regulate her emotions; suffered from impaired judgment and insight and, at times, was unable to "create a coherent story" as to what happened before she was in the hospital or events that occurred in the hospital; acknowledged only a day before the hearing that she had bipolar disorder, but declined to take recommended medication; and testified that, although she is not a violent person, she "sees red" when someone threatens to take her child away, as she believed her husband was doing. And, most significantly, appellant approached her husband with a hammer in a manner from which a rational factfinder could have found that she would have struck him had he not been able to close the door between them, and, after he closed the door, appellant began hitting the doorknob with the hammer.

In our view, a rational finder of fact could permissibly infer from appellant's behavior, symptoms, lack

of willingness to take recommended medication, lack of insight into her condition, and impaired judgment that she was highly likely to engage in future violence toward others absent commitment. *See T. T.*, 293 Or App at 385 (affirming trial court determination that appellant "was likely to engage in future violence if she did not remain hospitalized" after considering appellant's "past behavior that included a violent act, unabated symptoms that included psychosis, lack of willingness to take medi[c]ation, lack of insight into her condition, and impaired judgment"). Thus, the trial court did not err in committing appellant based on a determination that she was a danger to others within the meaning of ORS 426.005(1)(f)(A). We observe that appellant had not yet actually physically harmed anyone, but "[t]he trial court was not required to wait until appellant actually harmed someone before finding [her] to be a danger to others." *State v. K. S.*, 223 Or App 476, 486, 196 P3d 30 (2008).

In arguing for a contrary result, appellant contends that this case is analogous to *State v. T. M.*, 296 Or App 703, 437 P3d 1197 (2019). Although "[f]act matching in these kinds of cases is often of little utility because every involuntary mental commitment case must be decided on its individual facts under the applicable standards," *State v. D. L. W.*, 244 Or App 401, 405, 260 P3d 691 (2011) (internal quotation marks omitted), we briefly explain why this case is distinguishable from *T. M.*

In *T. M.*, the appellant suffered from bipolar disorder and had "stopped taking her medications." 296 Or App at 705. One day, after her ex-husband had upset her, she told her ex-husband that she was going to kill him, raised a fire poker over her head, and advanced towards him, although she did not actually swing the poker or strike her ex-husband. *Id.* at 705, 711. Additionally, during the commitment hearing in *T. M.*, the appellant had behaved in a disruptive fashion and was "out of control." *Id.* at 711.

We held that the evidence in that case was insufficient to establish that the appellant was dangerous to others, explaining that appellant threatening her ex-husband with the fire poker appeared to be "a classic example of an isolated occurrence of violence." *Id.* at 711 (internal quotation

marks omitted). We noted that, "[a]lthough that incident was serious, there was no evidence that it was part of a larger pattern of violence"; there was "no evidence of appellant ever engaging in any other violent acts against [her ex-husband] or anyone else, or of appellant threatening [her ex-husband] or anyone else, at any other time." *Id.* at 711-12. Additionally, regarding appellant's conduct during the commitment hearing, we noted that appellant being "verbally disruptive and rude" was not sufficient to establish "actual future violence was highly likely." *Id.* at 711 (internal quotation marks omitted).

In contrast, here, as recounted above, among other facts, appellant "postured" at a nurse and seemed like she was going to strike the nurse, required "chemical restraint" while hospitalized, mentioned her neighbor when asked about homicidal ideation, and expressed violent thoughts about her husband and neighbor. And, importantly, a rational finder of fact could find that appellant's conduct prior to hospitalization demonstrated a pattern of escalating physical aggressiveness: appellant grabbed her neighbor's dog; the next day, appellant grabbed her neighbor and said "let's go"; and the next day, when appellant's husband entered a bedroom where appellant was, appellant had a hammer in her hand and said to him "I think it's time for you to leave," appellant advanced toward her husband with the hammer held high, and her husband had to close a bedroom door between them, after which appellant started hitting the doorknob of the door with the hammer, denting the doorknob. Thus, in contrast to *T. M.*, this case does not involve "an isolated occurrence of violence." *Id.* (internal quotation marks omitted). On the whole, the evidence is legally sufficient to support the trial court's determination that appellant was a danger to others within the meaning of ORS 426.005(1)(f)(A).

Affirmed.