Submitted September 3, 2020, reversed September 15, 2021

In the Matter of K. M.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

K. M.,
*Appellant.*

Multnomah County Circuit Court
19CC05358; A172499

496 P3d 1099

In this civil commitment case, appellant appeals a judgment involuntarily committing her to the custody of the Mental Health Division for a period not to exceed 180 days and prohibiting her from purchasing or possessing firearms. She argues that there was insufficient evidence to prove that, at the time of the civil commitment hearing, she had a mental disorder that caused her to be dangerous to others. *Held*: The record did not support, by clear and convincing evidence, the trial court's determination that appellant posed a danger to others because of a mental disorder.

Reversed.

Julia A. Philbrook, Judge pro tempore.

Joseph R. DeBin and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jordan R. Silk, Assistant Attorney General, filed the brief for respondent.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

MOONEY, J.

Reversed.

**MOONEY, J.**

This is a civil commitment case. Appellant appeals a judgment involuntarily committing her to the custody of the Mental Health Division for a period not to exceed 180 days and prohibiting her from purchasing or possessing firearms. She argues that there was insufficient evidence to prove that, at the time of the hearing, she had a mental disorder that caused her to be dangerous to others. *See* ORS 426.005(1)(f)(A);[1] ORS 426.130.[2] Because we conclude that the record does not support, by clear and convincing evidence, the trial court's determination that appellant poses a danger to others because of a mental disorder, we reverse.

Appellant does not request, and we do not exercise our discretion to conduct, *de novo* review. We instead review the sufficiency of the evidence for legal error, mindful of the state's burden to prove its case by clear and convincing evidence and viewing the evidence and inferences permissibly drawn from that evidence in the light most favorable to the trial court's disposition of the case. *State v. E. J. J.*, 308 Or App 603, 604, 479 P3d 1073 (2021); ORS 426.130(1)(a). We state the facts, drawn from the record, in accordance with that standard of review.

Appellant is an experienced social worker. She has a master's degree in social work, and it appears that she may also have a PhD in that field. Appellant's next door neighbor, Grisham, testified that he and appellant had "been pretty positive neighbors for 13 years." That changed in June 2019, when appellant began sending him "a lot of text messages," beginning with one in which she expressed concern that she

---

[1] ORS 426.005(1)(f) defines "person with mental illness" as "a person who, because of a mental disorder, is one or more of the following: (A) Dangerous to self or others."

[2] ORS 426.130(1) provides, as relevant here:

"After hearing all of the evidence, and reviewing the findings of the examiners, the court shall determine whether the person has a mental illness and is in need of treatment. If, in the opinion of the court, the person:

"(a) Is a person with mental illness based upon clear and convincing evidence, the court:

"* * * * *

"(C) May order commitment of the person with mental illness to the Oregon Health Authority for treatment[.]"

was out of town and no one was watching her cats. Grisham testified that he did not know appellant was out of town and that she had not asked him to watch her cats. In response to her text messages, Grisham offered to watch her cats. He described a fairly extensive exchange of text messages that went from appellant checking in on her cats to a number of insults, threats, and accusations that she directed to Grisham, including a threat "to shoot [him] if anything happened to her cats."

Grisham testified that, although he noticed that appellant's car was parked at her house twice, he had not seen her since before the text message exchange that began in June 2019. But he was concerned that he might get out of his car one day and that he would "find [her] there." He was also concerned that appellant might call the authorities and lie about him.

Another witness, Sparkman, testified that she was the "acting supervisor" on duty when appellant came into Multnomah County Animal Services one day. Sparkman described her interaction with appellant as follows:

"I asked her—she was asking me about where her cats were. ***

"*****

"She seemed like she was getting a little bit agitated, so—and she came in, right as we were closing, it was about 4:15, we close at 4:30. Four thirty had passed, so I said, 'Hey, I'm sorry we're closed. There isn't anything we can do for you.' And I asked her to leave. She stated that she would not be leaving and that we would be staying—the two of us would be staying until I let her know where her cats were, even if it took us until midnight.

"She stated at some point that she was going to call the police and have me arrested for taking her cats. There was another comment of, 'God forbid if anything happened to them. You don't know what I'm capable of.' Things to those [sic] effect."

Bryson, a Portland police officer and member of the behavioral health unit, testified that he had "received a referral regarding" appellant in June 2019. After attempting to contact appellant, Bryson received two email messages

from her declining to meet with him. Those messages were lengthy and they contained comments about Bryson and other police officers that were personally and professionally insulting.

Wood, executive director of the Dougy Center for grieving children and families, testified that appellant interned with that agency in 2000 and 2001 and that she might have met appellant "in passing" then. However, she has more recently "received many phone calls, voicemails, and emails from" appellant, all of which were "combative, threatening, very mean[]spirited [and] accusatory." Specifically, Wood described appellant's communications as:

> "Lots of swearing, telling me that she was going to fucking dance on my grave. Telling me that she was going to fucking end us all. Telling me that I have lied in my own story of my mother's death to gaslight her. * * *

> "* * * * *

> "* * * [A]ccusing me of starting an arson fire at the Dougy Center in 2009. Accusing others that I work with of starting an arson fire at the Dougy Center in 2009. Accusing people of, you know, doing things to her to hurt her career while trying to forward our own career. * * *

> "Threatening—leaving voicemails, general voicemails at the Dougy Center threatening specific staff members as well as the staff as a whole. Saying that she, again, is going to fucking end us all. That we don't deserve to be in the positions that we're in."

Patterson, operations director at the Oregon Humane Society (OHS), testified that he was called down to the admissions department in April 2019 due to the presence of "an irate client," who turned out to be appellant. Appellant told him that they "had her animals," a statement he testified was not true. Appellant "continued yelling and cussing at [Patterson]" and began "talking about" OHS's executive director, Harmon—indicating that she was a veterinarian when that is apparently not the case—and the chief operating officer, August—questioning why someone with a law degree would be in his position with the organization. The police were called and appellant was "trespassed" from OHS.

Patterson testified that appellant later returned to OHS insisting that her cats were there and demanding that they return them to her. He described her voice as loud and said that she kept repeating, "I want to know where my fucking animals are. You give me my" cats. He testified to how the interaction then came to include Harmon:

"And then, at one point, down the hallway she saw our executive director Sharon Harmon and so she then saw Sharon. She goes, 'There's fucking Sharon Harmon,' and walked towards her and Sharon was like, 'You need to leave this location.' She's like, 'I don't have to fucking leave here. You can't tell me what the fuck to do.'

"And so, at that point, they were probably four or five feet—feet apart and—and she was yelling at Sharon and then she started closing that distance and then pretty soon she was, like, a foot away from Sharon yelling and I actually stepped in between them because I could tell Sharon was visibly upset so I stepped in between and, kind of, gave Sharon a wave and so she walked back through a secured door that we have. And, luckily, she walked away at that point."

When asked why he stepped in, Patterson stated that appellant was

"closing in on—on Sharon—like, as she was yelling at her, looking up—Sharon, moving in closer, and it was just—like, her voice was getting far more intense and I had been dealing with her for probably 15, 20 minutes and it—through all the aggression, she'd at least kept a distance from myself and other employees, but when engaging with Sharon, that distance was getting closer and closer ***."

At that point, appellant was taken to the Unity Center, a behavioral health facility that provides emergency services and inpatient care, by Project Respond.

Hancock, a psychiatric nurse practitioner employed at the Unity Center, came into contact with appellant when appellant was brought in from OHS on a "director's hold."[3] Hancock diagnosed appellant with "bipolar disorder" after reviewing her past medical records and interviewing

---

[3] We understand Hancock to have been referring to a mental health hold placed pursuant to ORS 426.233.

appellant. The symptoms Hancock observed supporting that diagnosis included "paranoid delusions, grandiosity, irritability, pressured speech." She described appellant as "hyper-verbal, impulsive, [with] poor insight and poor judgment." She prescribed risperidone, a medication used to treat certain mental and mood disorders such as bipolar disorder, but appellant has declined to take that medication.

Hancock testified that it is important for appellant to take the risperidone because "[appellant]'s been increasingly threatening in the community." In support of that conclusion, Hancock testified that (1) there had been three restraining orders against appellant,[4] (2) appellant had been sending "increasingly threatening and aggressive emails to various community entities and individuals, secondary to delusional thought content," and (3) she (Hancock) "felt threatened" by appellant when they spoke, indicating that she would have wanted "an escort" to her car were appellant to be discharged the night they spoke. Hancock confirmed that appellant had been placed in seclusion upon admission to Unity Center's inpatient behavioral health service. She also testified that, at the time of the hearing, appellant was no longer in seclusion or on the "safety suite." There had been no violent or problematic physical contact between appellant and staff and no attempts by appellant to elope or otherwise leave against medical advice.

Dr. Doherty, court examiner, testified that, based upon his observations made during the civil commitment hearing, he agreed with "Ms. Hancock's diagnosis of bipolar disorder." He "think[s that] persecutory delusions cause [appellant] to misinterpret the environment around her and as a result of that she makes very menacing and serious threats towards others." Further, appellant's bipolar disease,

> "which is the impulsive, disinhibited, and invasive behavior, is an indicator of her likelihood to act out on those threats and so I believe that there is clear evidence today that she

---

[4] Hancock relied on the existence of three restraining orders as evidence that appellant was "increasingly threatening in the community," but there is no evidence in the record of those restraining orders. Testimony from OHS staff confirmed that OHS never sought a restraining order. Whether the other two restraining orders Hancock referenced were actually sought, granted, or in existence at the time of the civil commitment hearing is not reflected in the record.

is a danger to others because of her mental disorder and she has no insight into this mental disorder even though she's testified about past hospitalizations as a result of it and I believe her unwillingness to treat, leaves her in the state she was when she came into the hospital, which does put others—others at harm."

Radecki, also a court examiner, testified that she "would agree with everything [Doherty] reported." She highlighted that appellant's small stature does not diminish how "scary" appellant is especially given that there have been "three restraining orders against her."[5] Radecki testified that appellant clearly believes that "people are out to get her," and she opined that, when one's "sense of safety is—is threatened, they react." Radecki concluded by testifying that "the scary thing in this situation that places others at risk is that we don't know what that reaction will look like."

It is clear that there was sufficient evidence to support the trial court's determination that appellant suffers from a mental disorder. Appellant acknowledges that she has been diagnosed with PTSD, which is a mental health diagnosis. Additionally, the testimony of Hancock, individually, and in conjunction with that of Doherty and Radecki, was sufficient for the court to conclude that appellant also suffers from bipolar disorder. But the diagnosis of a mental disorder alone does not support involuntary civil commitment. *State v. C. H.*, 306 Or App 63, 67, 473 P3d 60 (2020). Here, the state argued—and the court found—that commitment was justified because appellant poses a danger to others because of her mental disorder.

We recently recognized the established rule that civil commitment on the basis of danger to others requires the state to prove "'that actual future violence is highly likely.'" *State v. C. L.*, 313 Or App 539, 542, 495 P3d 748 (2021) (quoting *State v. M. A.*, 276 Or App 624, 629, 371 P3d 495 (2016)). While "[s]pecific acts of violence are not required" to prove future danger, *State v. M. R.*, 225 Or App 569, 574, 202 P3d 221 (2009), when a person with a mental disorder "has threatened others and has also carried out an overt

---

[5] Again, the record does not support the existence of any restraining orders.

violent act in the past against another person, those facts generally constitute clear and convincing evidence that the person is a danger to others" for purposes of ORS 426.130 (1)(a)(C). *State v. D. L. W.*, 244 Or App 401, 405, 260 P3d 691 (2011). However, an "isolated" overt violent act is generally "not sufficient to establish that appellant is an ongoing danger to others." *State v. E. D.*, 264 Or App 71, 75, 331 P3d 1032 (2014); *see also State v. L. D.*, 247 Or App 394, 400, 270 P3d 324 (2011) (reversing commitment where the appellant had only once "pushed" another person). In other words, speculation, or fear for what might happen next, is not enough and, even when there has been a single act of overt violence, such cases are "close cases." *C. L.*, 313 Or App at 543.

But this was not a close case. There was no evidence that appellant engaged in physical violence with anyone, either in isolation or otherwise. Reviewing the evidence in the light most favorable to the court's disposition, the evidence revealed that appellant's neighbor's fears were based on a number of text messages from appellant about her cats, including one where she threatened to shoot the neighbor if her cats were harmed and one in which she suggested that he be careful because his car was not safe. Appellant's neighbor was afraid that appellant might call the authorities and make false claims about him, and he also feared that he might someday get out of his car and find appellant there.

When the Portland police officer left phone messages and emails for appellant, she responded by email with a litany of insults and claims that might best be described as a tirade of anti-law enforcement complaints and personal insults directed to the officer himself.

When appellant told staff at Multnomah County Animal Services that she thought her cats were there, demanded their return, and insisted that she would not leave without them, her statements that "God forbid if anything happened to [my cats]. You don't know what I'm capable of" were vague and nonspecific. Appellant's communications with the Dougy Center also lacked specific content, and they did not provide insight into whether appellant planned, or had the capacity, to act on her statements—to "end [them]

all." Given that lack of specificity, such statements sound more like mere posturing than anything else.

The evidence concerning OHS was that appellant was angry and vulgar, that she thought her cats were there, and that she wanted them returned to her. The interaction concerning Harmon was presented by the state as key to its argument that appellant had escalated over time to the point where she "postured" and "closed in" on Harmon, requiring another person to step in and prevent contact. However, it is unclear from Patterson's testimony whether it was appellant who "closed in" on Harmon or whether they moved toward each other. That Patterson had stepped in between them and waved Harmon away leaves that question unanswered.

This case is distinguishable from *State v. S. E.*, 313 Or App 678, 679-80, 496 P3d 1140 (2021), where we affirmed a judgment of commitment when the appellant, who was bipolar and incorrectly believed that her husband and neighbor were having an affair, escalated from attempting to physically take the neighbor's dog, to grabbing the neighbor, to raising a hammer and swinging it toward her husband who narrowly avoided the blow by shutting the door between them, resulting in the appellant striking the doorknob with the hammer instead. To be sure, appellant here became more and more strident in her assertions that others wrongfully possessed her cats and that she wanted them returned without delay. Her communications most certainly became mean spirited and pointed. But this record, including the state's reliance on the interaction between appellant and Harmon at OHS, is not sufficient to support the conclusion that appellant presents a danger of future violence to others because of her mental disorder.

Reversed.